## Ex parte JACKSON.

(District Court, D. Montana.   February 12, 1920.)

### No. 798.

1. ALIENS ⬤➡54—CONSTITUTIONAL LAW ⬤➡311—SEARCHES AND SEIZURES ⬤➡7—DEPORTATION PROCEEDING, BASED ON EVIDENCE OBTAINED BY RAIDING ORDERLY MEETINGS, IS UNFAIR AND DENIAL OF DUE PROCESS.

A proceeding to deport an alien, on the ground that he was found advocating or teaching the unlawful destruction of property, is unfair and invalid, in view of the search and seizure and due process clauses of the Constitution, when based upon pamphlets obtained by forcibly raiding orderly meetings of the union to which he belonged, without warrant or process.

2. ALIENS ⬤➡54—MODE OF PROCUREMENT OF EVIDENCE BY UNLAWFUL RAID MAY BE RAISED ON HABEAS CORPUS.

Where the evidence on which a deportation proceeding was based was obtained by unlawful raids, without warrant or process, of the hall and

orderly meetings of a union, and the government freely disclosed the manner of obtaining the evidence in both the deportation proceeding and a proceeding for habeas corpus, the situation was not one wherein the mode of procuring the evidence could not be collaterally raised and determined at the trial.

3. CONSTITUTIONAL LAW ⊜½, New, vol. 4 Key-No. Series—VIOLATION OF RIGHTS OF PERSONAL SECURITY AND DUE PROCESS NOT WARRANTED IN WAR OR PEACE.

No emergency in war or peace warrants the violation of the rights of personal security and safety, and orderly and due process of law.

4. HABEAS CORPUS ⊜90—ON REVIEW OF DEPORTATION PROCEEDINGS OBJECTIONS MAY BE MADE IN BRIEF, AND ABSENCE OF OBJECTIONS WILL NOT PREVENT RELIEF WHEN PROCEEDING GREATLY INFRINGES RIGHTS.

On habeas corpus to review deportation proceedings, where the alien's objections have been excluded from the record, they may be made in the briefs, and unfairness in the proceedings, greatly infringing the alien's rights, will be noticed, whether or not objections have been made with technical precision.

5. ALIENS ⊜54—CONSTITUTIONAL LAW ⊜314—REFUSAL TO PRODUCE GOVERNMENT'S WITNESS FOR CROSS-EXAMINATION DENIED DUE PROCESS AND RENDERED PROCEEDINGS UNFAIR.

The refusal to produce one of the government's material witnesses for cross-examination in a deportation proceeding, unless the alien would disclose what he expected to prove and deposit the costs, denied due process of law, and rendered the proceedings unfair, though the government had another witness to the same matter.

Habeas corpus by John Jackson. Writ granted.

Nolan & Donovan and H. A. Tyvand, all of Butte, Mont., for petitioner.

E. C. Day, U. S. Atty., and W. W. Patterson, Asst. U. S. Atty., both of Helena, Mont., for respondent.

BOURQUIN, District Judge. Petitioner, held for deportation as an alien "found advocating or teaching the unlawful destruction of property," and who at time of entry "was a person likely to become a public charge," seeks habeas corpus, for that the evidence against him in the deportation proceedings was unlawfully secured, the proceedings were unfair, and the findings quoted without support. Respondent returns the record of said proceedings. Therefrom it appears that from August, 1918, to February, 1919, the Butte Union of the Industrial Workers of the World was dissatisfied with working places, conditions, and wages in the mining industry, and to remedy them was discussing ways and means, including strike if necessary. In consequence, its hall and orderly meetings were several times raided and mobbed by employers' agents, and federal agents and soldiers duly officered, acting by federal authority and without warrant or process. The union members, men and women, many of them citizens, limited themselves to oral protests, though in the circumstances the inalienable right and law of self-defense justified resistance to the last dread extremity. There was no disorder save that of the raiders. These, mainly uniformed and armed, overawed, intimidated, and forcibly entered, broke, and destroyed property, searched persons, effects, and papers, arrested persons, seized papers and documents, cursed, insult-

ed, beat, dispersed, and bayoneted union members by order of the commanding officer. They likewise entered petitioner's adjacent living apartment, insulted his wife, searched his person and effects, arrested him, and seized his papers and documents, and in general, in a populous and orderly city, perpetrated a reign of terror, violence, and crime against citizen and alien alike, and whose only offense seems to have been peaceable insistence upon and exercise of a clear legal right.

The raid of February, 1919, three months after practical end of the war, was upon a union meeting in discussion of the condition created by a reduction of $1 per day made in miners' wages. Petitioner, arrested, for several days was imprisoned and denied bail and counsel. He was then taken before an immigration inspector, flanked by a policeman and a soldier, and, these four alone present, was interrogated. He objected generally, but finally answered, and also in respect to pamphlets seized as aforesaid and introduced in evidence against him. At later appearances before the inspector, petitioner was permitted to have counsel. At these, statements made by raiders, without petitioner's presence, identifying papers and pamphlets so seized, and somewhat in respect to petitioner's conduct of a union meeting, were introduced in evidence against him. Some of these raiders were produced for petitioner's cross-examination, but one, Sergeant Ambord, was not. Petitioner demanded his production, and was denied, because he would not comply with a condition that he state what he expected to prove by Ambord and that he deposit costs. Objections by petitioner throughout the proceedings are excluded from the record and are now forgotten.

The facts in respect to the condition and objections aforesaid appear ex necessitate by oral testimony in the instant proceeding. The record further discloses that petitioner is a young, able-bodied man, and was when in 1915 he entered with his wife; that since entry he has supported his family, including a child here born, by ordinary mining and other labor; that in 1917 he joined the aforesaid organization, and for the latter half of 1918 was assistant secretary of the Butte union, and also janitor of the hall for a Finnish society, its owner. He disclaims advocacy, teaching, or belief in unlawful destruction of property, admits having seen some of the pamphlets in the hall and for sale, admits having sold any thereof asked for and on hand for sale, admits having read some thereof, but, disremembering contents, cannot say he indorses them. These pamphlets are assumed to advocate and teach sabotage, and because thereof, and of petitioner's status and relation to them as aforesaid, in the deportation proceedings it is inferred and found that he advocated and taught unlawful destruction of property. Without these pamphlets, and brought home to petitioner, there is no evidence against him.

[1, 2] Pretermitting review of these pamphlets, and having in mind the political control over aliens, the summary character of deportation proceedings, and the limited jurisdiction of courts in respect thereto, it is believed the deportation proceedings are unfair and invalid, in that they are based upon evidence and proce-

dure that violate the search and seizure and due process clauses of the Constitution. The situation is not one wherein the mode of procurement of evidence cannot be collaterally raised and determined at a trial (see Silverthorne's Case [Jan. 26, 1920] 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. ——), but is one wherein the government in both the deportation proceeding and this at bar freely discloses its own wrong by which it secured the evidence. The law and courts no more sanction such evidence than such methods, and no more approve either than the thumbscrew and the rack. Otherwise the vicious circle of age-old tyranny—to subject to and convict by unlawful means because guilty, and to condemn as guilty because subjected to and convicted by unlawful means, to which both alien and citizen fall victim. The Declaration of Independence, the writings of the fathers, the Revolution, the Constitution, and the Union, all were inspired to overthrow and prevent like governmental despotism. They are yet living, vital, and potential forces to those ends, to safeguard all domiciled in the country, alien as well as citizen.

[3] For the inalienable rights of personal security and safety, orderly and due process of law, are the fundamentals of the social compact, the basis of organized society, the essence and justification of government, the foundation, key, and capstones of the Constitution. They are limited to no man, race, or nation, to no time, place, or occasion, but belong to man, always, everywhere, and in all circumstances. Every nation demands them for its people from all other nations. No emergency in war or peace warrants their violation, for in emergency, real or assumed, tyrants in all ages have found excuse for their destruction. Without them, democracy perishes, autocracy reigns, and the innocent suffer with the guilty. Without them is no safety, peace, content, happiness, and they must be vindicated, defended, and maintained in the face of every assault by government or otherwise. All judgments based upon their violation must be set aside.

Assuming petitioner is of the so-called "Reds" and of the evil practice charged against him, he and his kind are less a danger to America than are those who indorse or use the methods that brought him to deportation. These latter are the mob and the spirit of violence and intolerance incarnate, the most alarming manifestation in America today. Far worse than the immediate wrongs to individuals that they do, they undermine the morale of the people, excite the latter's fears, distrust of our institutions, doubts of the sufficiency of law and authority; they incline the people toward arbitrary power, which for protection cowards too often seek, and knaves too readily grant, and subject to which the people cease to be courageous and free, and become timid and enslaved. They advocate and teach, not only unlawful destruction of property, but in addition unlawful destruction of persons, and they engage in the practice of both. They lay the ax to the root of all government. Doubtless some of those, of some variety of prestige, who horrify the thoughtful lovers of America by their loose suggestion and advocacy of stone walls, shootings at sunrise, and other lynch law, are animated by sincere, but mistaken, con-

263 F.—8

cern for national welfare; but equally doubtless many of them are incited by unholy desire for personal advantage—money profit, popular approval, or political preferment. They are breeders of suspicion, fear, anger, revenge, riot, crime, class hatred, "Reds," despotism, threatening, if aught can, civil anarchy and revolution, and they and the government by hysteria that they stimulate are more to be feared than all the miserable, baited, bedeviled "Reds" that are their ostensible occasion and whose sins they exaggerate.

The application of the principle that convicted the Haymarket anarchists may hold guilty these advocates of lynch law, if their recommendations be followed, unless, indeed, there are distinctions in administration of criminal law. They are no new thing, these present excesses. They are the reactions of all great wars, and in due time run their course. In his Constitutional History of England, Freeman describes much the same following the Napoleonic wars, viz. that in England those who ventured to raise their voice to reform corrupt politics and oppressive government, or to improve conditions for the working class, were bitterly denounced as pro-French, charged and tried for treason, popular clamor and violence directed against them, and the bar intimidated from defending them. How history doth repeat itself! The situation vindicates the wisdom of the philosopher who observed that in war the belligerents tend to exchange of national characteristics. It is said that Prussia approaches ultra democracy, and it seems that America verges upon Prussian autocracy. And yet confidence in the Constitution and national sanity is justified. All extremists will fail to overthrow them. Even as the "Reds," the advocates of arbitrary power, whether within or without law, will in due time pass away. It is for the courts to restrain both, when brought within jurisdiction.

[4, 5] In so far as petitioner asserts unfairness, in that his objections are excluded from the record, the rules permit objections to be made in briefs. Whether fair or not in ordinary cases, in a case wherein the alien's rights have been infringed to the extent here, the court will take note of it, whether or not objections have been made with technical precision, and hold the proceedings unfair. So were the proceedings unfair for failure to produce Ambord for cross-examination. The rules require his production. The condition the inspector imposed is unwarranted. It is authorized only in respect to petitioner's witnesses, and not in respect to government's witnesses and their cross-examination. Ambord was a vital witness. He identified pamphlets as those seized, an essential link in the chain of circumstances. Although there was another witness to the same matter, none the less was the alien entitled to the benefit of the rule, and to cross-examine Ambord; and failure to produce Ambord denied the alien the due process of the rule, and is fatal to fairness of the proceedings. It cannot be said that in any event the decision would have been the same, unless it also be said that in any event the alien was to be deported. There is indication of the latter. It is found in the finding that he "was a person likely to become a public charge" when he entered. This is a make-weight precaution, without a scintilla of evidence to

support it. The inspector, who first advanced it, in the next paragraph complained that petitioner "was working and earning a good salary, but never purchased any War Savings Stamps or Liberty Bonds." This and like war references betray some the atmosphere surrounding the proceedings.

The writ is granted.