### Ex parte CAMINITA.

(District Court, S. D. New York. November 8, 1922.)

1. **Aliens ⬅54—Evidence obtained by unlawful search in violation of another's constitutional rights admissible.**

    Assuming that protection of Const. Amends. 4 and 5, against unlawful searches, applies to deportation proceedings, evidence obtained from third person's possession upon unlawful search in violation of his rights was not inadmissible against alien sought to be deported.

2. **Aliens ⬅54—Immaterial where there is sufficient evidence that other illegal evidence was admitted.**

    On habeas corpus to review deportation order where there was other unexceptionable proof requiring deportation, it was immaterial that evidence obtained by illegal search was admitted.

3. **Habeas corpus ⬅79—Return controlling on question whether objection taken.**

    Where return in habeas corpus proceeding to review deportation order states no objection was taken at the hearings to admission of certain proof, and it stands uncontradicted, it controls.

4. **Aliens ⬅53—Adherent of direct action describing himself as "anarchist" held subject to deportation as such.**

    An adherent of direct action, who had chosen the word "anarchist" as describing his own beliefs and activities, *held* subject to deportation as such.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Anarchist.]

5. **Aliens ⬅53—One an "anarchist" whatever means he adopts.**

    An alien is as much an "anarchist" whether he adopts as means rant and gunpowder, or rational persuasion and the inner light.

Habeas corpus by Ludovico Caminita. Writ dismissed, and relator remanded.

Rose Weiss, of New York City, for petitioner.

LEARNED HAND, District Judge. There can be no question that the record contains ample evidence to sustain the finding that the relator is an anarchist. The testimony to the mailing of three bundles of papers in June, 1919, coupled with the subsequent finding of similar bundles of "La Jacquerie" in the mail of those three boxes is in itself persuasive (though, of course, not conclusive) that it was he who was distributing that paper. I have no translation of it, but I understand that no one disputes that it was an avowed anarchistic publication.

[1] Again the relator's admissions on the hearing that it was he who set up the types from which the "proofs" were taken in Mazzotta's composing room, coupled with the "proofs" from those types themselves, put the question beyond doubt. The translation is so atrocious that, not being able to read the Italian, I cannot be certain of much of its meaning; yet there can be no doubt that the article was intended to establish the reputation of the relator as a loyal anarchist against the perfidious accusations of one Valenti. It is urged that these proofs were obtained by an unlawful search, and I may assume without deciding that they were, and that, being so obtained, the same constitutional protection will prevent their use in deportations as in criminal prosecutions.

But it was Mazzotta, and not the relator, whose rights were invaded, and unless the evidence incriminated him it could have been produced here. The relator, having lost possession of it, would have had no complaint if Mazzotta were compelled to produce it. It does not appear that the documents incriminated Mazzotta, and I have no right to take it either way. The most that can be said is that by a wrong against Mazzotta the officials learned of the existence of competent evidence against the relator, which otherwise they would not have got. Silverthorne Lumber Co. v. U. S., 251 U. S. 385, 40 Sup. Ct. 182, 64 L. Ed. 319, does establish that evidence, competent as such, may become incompetent because knowledge of its whereabouts was acquired by a wrongful search of the holder.

This will not, however, serve the relator. The Fourth and Fifth Amendments protect the individual against the use of evidence obtained from himself, but nowhere can the notion be found that he may invest himself with the wrongs done to another. It may be undesirable that officials should make any use whatever of what they learn illegally, but only the person wronged may protest against their conduct. A right turning upon the inviolability of one's own possession is a clean different thing from that depending upon the possession of another. Each may be desirable, but the Constitution has selected only one.

[2] There was also much other evidence introduced which was unlawfully seized from the relator himself. I may assume again without deciding, Ex parte Jackson (D. C.) 263 Fed. 110, that it may be used as little in deportations as in criminal prosecutions. I may equally assume that the testimony taken on February 14, 1920, was the equivalent of a confession and that the circumstances were such as would prevent its use here as well as though it were introduced upon a trial under an indictment. If such evidence were wrongly admitted, the verdict would be set aside, for no one can be convicted without a law-

ful verdict. But the same conditions do not obtain here. If there was unexceptionable proof which has required deportation, it makes no difference that there was unlawful proof which corroborated the conclusion. At most, having set aside the finding, I must determine whether the alien is entitled to remain. The legally produced evidence shows that he is within the excluded classes.

[3] I have purposely ignored a procedural difficulty because I wished to dispose of the cause upon the merits. It is this: The relator was represented by counsel, and the return says that no objection was taken to the admission at the hearings of any of the proof. The petition contradicts this as to documents obtained from others than the relator (including therein Mazotta), but not as to the proof I am speaking of. That would prevent the assertion two years later of any such protest as this. Strictly, the record is regular. Indeed, under the rules the objection must appear in the briefs submitted to the deportation authorities; those briefs would have to be part of the return. But I do not press that; the return stands uncontradicted and controls.

[4, 5] A final point is whether the proof brings the relator within the term "anarchist." It would be most unreal to import into the word nice considerations based upon an understanding of the varieties of revolutionary agitation. It is quite enough that the relator has chosen this word to describe his own beliefs and activities. If he is not a follower of Prince Kropotkin, but an adherent of "direct action," he is none the less within the class described, even though he may be also properly covered by some later clauses of the section. One is as much an anarchist whether one adopts as means rant and gunpowder as rational persuasion and the inner light.

Writ dismissed; relator remanded.