MARY KAVANAUGH FEATHERS, PETITIONER, *v.* COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT.

Docket No. 8518.   Promulgated February 20, 1947.

*Frank H. Deal, Esq.*, for the petitioner.
*Thomas R. Wickersham, Esq.*, for the respondent.

OPINION.

DISNEY, *Judge*: The point of difference now between the parties is the cost basis of the "B" preferred stock sold by the petitioner in each of the taxable years. The petitioner contends, in effect, that she acquired the stock for cash at $35.50 a share in connection with the recapitalization of the bank. The respondent's position is that the petitioner exchanged her rights in the contribution of $55,000 she made to the bank for the stock in a taxable transaction and, that accordingly, the petitioner's basis is the fair market value of the stock at the time of the exchange.

The parties are not in agreement on the status of petitioner with respect to contribution she made to the bank. Neither contends on brief that it was a contribution of capital. Petitioner says that the money was deposited with the bank as security for depositors and was held in escrow until the occurrence of conditions subsequent. The respondent argues that petitioner was a contingent creditor of the bank. The correct answer to the question will point to the solution of the primary issue.

In August 1931 and January 1932 the financial condition of the bank was not good because of decreases in the value of bonds held as assets of the institution. The Superintendent of Banks of New York insisted that the loss in value be made good by an increase of capital. In lieu thereof the bank called upon some of its stockholders, including the petitioner, for financial assistance. The objective was to obtain additional protection for the funds of depositors of the bank. Petitioner and other stockholders agreed to put up certain specified amounts upon terms set forth in instruments they executed. These documents contain the understanding of the parties on their rights to the money.

The instruments provided that the money was "for the better security of the depositors of" the bank: that the agreement was to be effective until such time as in the opinion of the Superintendent of Banks of New York the securities of the bank had increased sufficiently to protect the depositors; and that in the event of liquidation of the bank the money and securities were to be used, if necessary, to pay depositors in full, any excess to be repaid to the contributors. The fact that the bank credited the amounts first to profit and loss and

then transferred the amounts to surplus, and paid petitioner interest on the amount of her participation in the plan, was outside the scope of the agreements, for nothing therein suggests a contribution to surplus, or an obligation to pay interest. All of petitioner's rights to a return of all or part of the money depended upon the need of the funds to pay depositors in possible liquidation proceedings of the bank, and, in the absence of such proceedings, upon the judgment of the Superintendent of Banks of New York on whether the depositors were otherwise fully protected. Under another instrument she extended the protection to $97,500 of debenture bonds, subject to claims of depositors, until released in writing by the Reconstruction Finance Corporation, the holder of the bonds.

The Superintendent of Banks of New York never authorized the bank to relinquish the amounts except in connection with the plan of recapitalization of the bank. In the absence of proof, we must assume that the Reconstruction Finance Corporation never gave its consent to repayment of the contributions. The inference from what occurred is that such consent as it gave was limited to an exchange of the contribution of petitioner for "B" preferred stock. Even if the Reconstruction Finance Corporation had given its consent, that of the Superintendent of Banks was still necessary. Thus, petitioner was never in a position to enforce a claim for payment of the bank's obligation in cash. She agreed to the application of her contributions, except for the cash payment of $10.50 representing the difference between her subscription for "B" preferred stock and her contributions, for "B" preferred stock of the bank. The effect of the transaction was an exchange of her rights against the bank, a property right, for shares of its stock.

The petitioner, however, points to the subscription agreement, in which she agreed to pay cash for the stock at the rate of $35.50 a share. Another provision obligated petitioner to authorize the bank, upon its demand, to apply against her subscription the amount of her contributions. Such an application was made, and what occurred, rather than what might have happened, is controlling. The superintendent of banks never authorized the payment of cash to petitioner, other than $10.50, and petitioner never had a right to cash. As the transaction was consummated, there was an exchange of the bank's obligation for shares of stock, not a payment of cash with an agreement to invest the cash in stock. There is no proof that the petitioner's cash position was such that she could have paid $35.50 in cash. In any event, petitioner disposed of her rights against the bank for stock, an event with tax consequences. At that time petitioner realized taxable gain or sustained a loss measured by her outlay of $55,000 and the fair market value of the stock, plus the cash. *Commissioner* v. *Sisto Financial Corporation*, 139 Fed. (2d) 253; *Elverson Corporation* v. *Com-*

*missioner*, 122 Fed. (2d) 295, affirming 40 B. T. A. 615; *Lammerding* v. *Helvering*, 121 Fed. (2d) 80, affirming 40 B. T. A. 589; *Chemical National Bank of New York*, 30 B. T. A. 178; *Turner Falls Power & Electric Co.*, 15 B. T. A. 983.

The deduction of $14,996.50 (two-thirds of $22,494.75) claimed by the petitioner each year as a long term capital loss, was based upon cost of $35.50 a share. The stock was acquired in a transaction resulting in gain or loss to petitioner and, as a result, the basis of the stock to her was its fair market value at the time acquired. *Fairmount Foundry, Inc.*, 42 B. T. A. 1087; *First National Bank, Philipsburg, Pennsylvania*, 43 B. T. A. 456; *Bennett* v. *Commissioner*, 139 Fed. (2d) 961.

The respondent disallowed the deductions upon the ground that the loss was sustained in a prior year. The basis for his conclusion that the loss did not occur in the years in which shares of the stock were sold does not appear in the record. His present position, made clear at the hearing, is that the loss, if any, occurred when the sales were made, but that none was sustained since the fair market value of the stock when acquired was no more than the selling price of about $6.50 a share.

The petitioner also contends that, under the theory of respondent, she could have claimed a bad debt deduction for such part of her contribution as was worthless in 1939, or postpone the deduction until 1940 and 1941, when the transaction was closed. The basis for the argument is that a debtor and creditor relationship existed. There was no unconditional promise on the part of the bank to pay the contribution or any part of it at any time in the future. It never agreed to do more than exchange its contingent obligation for stock. Clearly there is no basis here for a bad debt deduction. *W. S. Gilman*, 18 B. T. A. 1277; affd., 53 Fed. (2d) 47; *Pancoast Hotel Co.*, 2 T. C. 362; *Clay Drilling Co. of Texas*, 6 T. C. 324.

Petitioner had the burden of proving a deductible loss and the amount thereof. *Burnet* v. *Houston*, 283 U. S. 223.

While the petitioner relies primarily upon the theory that she purchased the stock for $35.50 a share, she contends under respondent's theory that the stock had a value of $35.50 a share when issued, and in support thereof points to the subscriptions at that price and two alleged sales of the stock at the same figure.

The subscription agreements were executed under the plan adopted for recapitalizing the bank and do not represent arm's length negotiations on the value of the stock. The effect of the subscription was to enable the subscribers to obtain stock for the contingent liability of the bank to repay the contributions. The stock, at most, had no value in excess of the rights exchanged therefor, and, considering the finan-

cial condition of the bank at that time, it is obvious that the value was not $35.50 a share.

One of the alleged sales was made in May 1939 of 169 shares by the president of the bank. The testimony shows that the president gave his note for $6,000 to the bank in the 1931 and 1932 transactions. In February 1938 the alleged buyer loaned the president money to pay the note in consideration of 400 shares of common stock of the bank and the president's rights to subscribe for stock when the recapitalization, then being considered, was adopted and made effective. Thus, the alleged buyer was, in effect, a subscriber to "B" preferred stock, as petitioner was. The deal was consummated about 15 months before the stock was issued and at a time when it was not known what the plan of recapitalization would be. There is nothing in the transaction to shed light on the value of the stock in April 1939. The other transaction involved a transfer of four shares, being unallotted shares in the recapitalization, in May 1939 by the president to a stockholder of the bank since 1919, and an officer and a director since about January 1938. The buyer had declined to participate in the purchase of the stock in connection with the recapitalization. The transaction has all of the appearance of an accommodation purchase without regard to the actual value of the stock.

We are unable to find from the evidence that the stock had a fair market value when acquired by petitioner in excess of the selling price in the taxable years. Accordingly, we hold that the respondent did not err in disallowing the loss deductions in question.

*Decision will be entered under Rule 50.*