THE FEDERAL NATIONAL BANK OF SHAWNEE, OKLAHOMA, PETITIONER,
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 15342. Promulgated January 17, 1951.

*John E. Marshall, Esq.*, for the petitioner.
*John P. Higgins, Esq.*, for the respondent.

OPINION.

DISNEY, *Judge:* This case, after trial and decision entered on May 18, 1949, was appealed, and is now before us upon remand, the mandate having been issued March 21, 1950; *Federal National Bank of Shawnee* v. *Commissioner*, 180 Fed. (2d) 494. We are thereby commanded to adjudge the determination of the Commissioner invalid and to take further proceedings in accordance with the views expressed in the opinion of the court.

Pursuant to said mandate we set the matter for April 19, 1950, for hearing in Washington, D. C., and on the motion of the respondent that it be continued to Oklahoma City in order that the Commissioner might introduce evidence with a view to determining the correct tax liability or otherwise move to conform to the opinion of the Court of Appeals, the case was continued to May 15, 1950, at Oklahoma City, and on May 15 and May 19, 1950, the case was reheard and further evidence taken after the filing of an amended answer by the respondent, to which the petitioner filed reply.

In obedience to the mandate we declare and adjudge the determination of the Commissioner as expressed in the deficiency notice involved herein, to have been invalid.

The findings of fact made by us in connection with our earlier opinion are by reference again made findings here (though it is not considered necessary).

In addition we further find: The petitioner's return for the year 1944 was made on an accrual basis. In the notice of deficiency the Commissioner adjusted the $1,473.90 net income reported by the addition of $32,021.51, consisting of $19,645.24 proceeds of life insurance policy, $4,297.12 adjustment of collection expense, $2,664.34 miscellaneous expense adjustment, $1,600 capital gains increased, and $2,814.81 deduction for bad debts decreased. Against this he deter-

mined nontaxable income and additional deductions in the total amount of $3,886.31. This resulted in a net adjustment of $27,155.20. The petition filed here placed in issue only the $19,645.24 matter of insurance policy.

The fair market value of entire assets transferred by the Bank Commissioner to the Guaranty State Bank on July 12, 1922, under the contract of that date, including the note and insurance policies and mortgage and note on Adams' house and any deficiency judgment transferred by the Bank Commissioner was not over $10,000. The cash surrender value of the $20,000 policy when it was assigned by Patrick H. Adams, the assured, to the petitioner on December 24, 1924, was, as shown by the policy, $1,760. The policy shows on its face that the annual premium was $821.20. No premiums were paid after November 10, 1929, and about May 8, 1930, the policy was converted into a paid up policy from November 10, 1929, until July 30, 1941.

On May 8, 1950, subpoena *duces tecum* was issued in this case to J. F. Buck, president of the Federal National Bank of Shawnee, Oklahoma, to appear on May 15, 1950, to testify on behalf of the respondent and to bring with him the following records:

The Minute Book of the Security State Bank of Shawnee, Oklahoma, covering the period from December 14, 1920, to March 24, 1923.

The Minute Book of the Federal National Bank of Shawnee, Oklahoma, covering the period from March 24, 1923, to December 31, 1929.

All records covering the assumption by the Guaranty State Bank of the assets and liabilities of the Security State Bank of Shawnee, Oklahoma, on December 14, 1920, and on July 10, 1922, itemizing each asset and showing the ultimate disposition of each asset, whether charged off or collected.

All records covering any accounts owed by Patrick H. Adams from the time of the organization of the Security State Bank through the organization of the Guaranty State Bank and the organization of the Federal National Bank, showing the amounts owed by Patrick H. Adams, or collateral on any debts owed by him, and the payment or final disposition of Patrick H. Adams' obligations, showing whether the obligations were paid or charged off.

All records showing the payment of life insurance premiums on a policy on the life of Patrick H. Adams with the New York Life Insurance Company in the amount of $20,000.00, showing whether the premiums were deducted on the income tax returns of the Federal National Bank in the years 1923 to 1929, inclusive.

He was served and appeared on that date, and on May 19, to which the matter was continued for trial, but of the records subpoenaed produced only some minutes taken from minute book of Guaranty State Bank covering from December 14, 1920, to about March 24, 1922, also a scrapbook containing reports, published in response to call from the comptroller, of statements of banks in which petitioner was interested. All other records of the petitioner covering the Adams loan and insurance policy (except those placed in evidence

on the earlier trial of this case) had been burned about January 1, 1949. The bank moved on June 18, 1949, into a new building. There was no reason for destroying the records except storage space. Petitioner's president received a copy of a letter addressed to petitioner's counsel of record about April 25, 1950, requesting that certain records be made available to the respondent and was called upon about May 3, 1950, by the attorney for the respondent and a Mr. Antoine who spent about two hours in the bank.

In the light of the facts above found and referred to, the mandate and new trial and additional briefs, we have reconsidered this matter. A recapitulation of the history of the question would seem helpful: The petitioner's return for the taxable year recited that the insurance policy here involved was assigned to the petitioner's predecessor as collateral in 1920 and that thereafter the bank charged off various amounts of loans against earnings, in years in which no tax benefit was derived from chargeoffs, and that the position of the bank was that recovery on the collateral insurance policy did not constitute income. The return did not disclose that the policy had been assigned absolutely to the petitioner in December 1924. The deficiency notice determined that the insurance policy had been acquired for consideration but did not recite the amount thereof. The petition filed in this Court alleged that on December 24, 1924, Adams assigned his retained interest in the life insurance policy to the petitioner, for value received, but did not state or explain the value received or the consideration passing. Upon the original trial the petitioner took the view that the determination was erroneous, arbitrary and capricious and that the Commissioner should have the burden of proof. After the remand and on the second trial, and upon brief, petitioner took the same view. Evidence was adduced by the respondent to show the consideration for the transfer by Adams of the insurance policy involved to the petitioner about December 24, 1924. The position of the respective parties may be summarized as follows: The petitioner contends that after the finding by the Circuit Court that the deficiency determined was invalid, "respondent failed to sustain his burden of proof as to the amount of the consideration paid by the taxpayer for the assignment of the policy and the cost basis of the policy to the taxpayer," whereas the respondent's view is, in effect, that the consideration paid by the taxpayer for the assignment by Adams was $4,678, being $1,760 cash surrender value of the policy at the time of the transfer plus $4,105 premiums paid by the petitioner after the transfer, less $1,187 dividends credited on the policy. The respondent argues also, in the alternative, that of the recovery from the insurance company in 1944 $3,942.36 was interest, therefore income to the petitioner.

It is clear from the record before us that of adjustments to income made by the deficiency notice in the net amount of $27,155.20 only $19,645.24, the proceeds of the life insurance policy, were placed in issue; that the petitioner's return claimed the entire $23,942.36 insurance recovery as exempt, obviously under section 22 (b) (1) of the Internal Revenue Code which provides, in general, that amounts received under life insurance contract paid by reason of the death of the insured, shall be exempt from taxation; that the determination of deficiency is on the theory that the recovery being made by a transferee of the policy for valuable consideration "only the actual value of such consideration and the amount of the premiums and other sums subsequently paid by the transferee shall be exempt from taxation under paragraph (1) or this paragraph," under section 22 (b) (2) (A).

The respondent upon the second trial admitted the alleged amount of the premiums paid, but also pleaded that the amount was $4,105, although the amount alleged in the petition, as to the period after transfer of the policy, was only $3,364.80.[1]

Until December 24, 1924, the petitioner and its predecessors held the Adams insurance policy only as collateral. Upon that date the petitioner took an absolute conveyance and in consideration thereof released Adams from his obligation, including a mortgage he had also given as collateral. In our opinion, upon reconsideration of this whole question, we are here concerned not with the indebtedness of Adams prior to December 24, 1924, and the collateral (which included the mortgage and another insurance policy) which he put up against such indebtedness, but the question here involves only the consideration paid for the absolute transfer on December 24, 1924. It is apparent from the language of section 22 (b) (2) (A) above quoted (that "only * * * and other sums *subsequently* paid * * * shall be exempt * * *" [emphasis added]) that previous investments are not included, and it should not be forgotten that this is a statute granting exemption, therefore to be strictly construed.[2] It seems apparent that it was the intent of Congress to differentiate between the position of the beneficiary in the collection of an insurance policy tax-exempt to him and the transferee of such policy for valuable consideration, and that Congress, in effect, provided that a transfer was an ordinary com-

---

[1] By amended answer respondent admitted the allegation of the petitioner that premiums were paid by the petitioner, in the amount of $1,642.40 before December 24, 1924, and $3,364.80 thereafter. Replying to respondent's allegation that petitioner's "cost (or basis)" was the cash surrender value, plus $4,105 premiums paid from December 24, 1924, through 1929 less $1,187 dividends, the petitioner admitted "that a part of petitioner's cost (or basis) of the policy is represented by premiums paid from December 24, 1924, through 1929 * * *." This, in effect, leaves argument between the parties only as to the consideration paid, plus respondent's idea of diminishing the premiums because of dividends. On brief, also, respondent speaks of the premiums paid after that date as $4,105. Though this figure may be mathematical error, overlooking the fact that only $80 was paid, as alleged, in 1929, we limit the respondent to his pleading and treat the matter as $4,105.

[2] *Helvering* v. *Northwest Steel Rolling Mills, Inc.,* 311 U. S. 46.

mercial transaction involving a basis of the transferee for purposes of future taxation, from which it follows that the transfer and the release of Adams from the previous obligation to the petitioner might result in profit or loss to the petitioner, to be considered in the computation of income tax at that time. The pledgor-pledgee contract became a closed transaction.[3] If a loss was taken by the petitioner upon the Adams indebtedness it could have been claimed on the return for the year 1924. It can not, in our opinion, enter into the present question or determine the consideration paid for the transfer. In *St. Louis Refrigerating & Cold Storage Co.* v. *United States*, 162 Fed. (2d) 394, insurance policies were assigned as security for debt. At the time of the assignment there was a cash surrender value. In 1933 $25,000 of the indebtedness evidenced by the notes was charged off and tax liability reduced. The insured died in 1941. Contention was made that the transfer was not for a valuable consideration but that if there was it was the original debt. The court said:

\* \* \* But manifestly, the face value of the notes did not represent the "actual value" of the consideration for the assignment. The notes were not executed as a part of the same transaction but had been executed long before the execution of the assignment. \* \* \*

\* \* \* \* \* \* \*

We think the insurance contract when it was transferred and pledged lost its character as insurance in the hands of the pledgee within the meaning of the statute. It became simply collateral security.

\* \* \* Here the recovery was on the collateral security and the incidental fact that the proceeds of this insurance policy would have been exempt to the beneficiary named does not mark it as exempt where it has become a matter of barter rather than a matter of insurance.

In short, the effect of the case is that an insurance policy, pledged, is no longer insurance, but merely commercial collateral, and the insurance provisions do not apply. This appears to eliminate consideration here of the history of this policy prior to December 24, 1924. A recovery during that period, upon the pledged policy, would merely have been as on any other collateral. The transaction of December 24, 1924, can not be regarded differently, and therefrom the petitioner took a basis of fair market value, as its consideration for future disposition. The petitioner indeed appears to agree that this is a question of basis, for its reply to amended answer admitted that the premiums paid after December 24, 1924, were "a part of petitioner's cost (or basis) \* \* \*." We have considered the matter of settlement of indebtedness secured by a life insurance policy. In *Citizens Trust Co. of Utica*, 2 B. T. A. 1239, the taxpayer received insurance policies as collateral to notes. The borrower became bankrupt. It

---

[3] In *Alcy Sivyer Hacker*, 36 B. T. A. 659, discussing an insurance policy we said: "If the insured transfers the policy for a valuable consideration the transferee becomes an investor in the policy."

was held that the taxpayer sustained a deductible loss between the amount of the obligations and the cash surrender value of the insurance policies at the time surrendered. In *Dominion National Bank*, 26 B. T. A. 421, the situation was much the same. Petitioner held as security policies of life insurance on the lives of its debtors. In 1928 it was determined that the debts were uncollectible. It was held that the difference between the amount of the debts and the cash surrender value of the policies was deductible as worthless debt. In *Estate of John Cadwalader*, 15 B. T. A. 1, life insurance policies were held as collateral to a debt. The debtor was discharged in bankruptcy but the taxpayer did not surrender the policies or otherwise foreclose on them but continued them in force. A deduction of the difference between the debt and the cash surrender value as a debt ascertained to be worthless and charged off in 1920 was denied because the Revenue Act of 1918 did not permit deduction for an indebtedness worthless only in part, and there was no ascertainment of worthlessness in 1920; also in the absence of the foreclosure upon the collateral there was no loss. In *Northern National Bank*, 16 B. T. A. 608, a bank held a life insurance policy as collateral for a note. The debtor disappeared leaving no address, in 1918, and the petitioner by authority of the Federal National Bank Examiner charged off the unpaid balance of the debt. It was held that the debt was worthless and that since the policy was a term policy without cash surrender value or other value the amount of the deduction should not be decreased because of the policy. In *King Plow Co.* v. *Commissioner*, 110 Fed. (2d) 649, a life insurance policy was transferred by the beneficiary to the petitioner in a merger. The Commissioner was affirmed in computing the petitioner's income by including therein the amount paid petitioner on death of the insured, less the cash surrender value of the policy at the time of acquisition, and premiums subsequently paid on the policy. The Circuit Court said that the policy was an asset in the hands of the assignor having a value at least equal to its cash surrender value and that it became an asset of like value to the petitioner immediately upon transfer to it.

The transaction between petitioner and Adams on December 24, 1924, was clearly one resulting in gain or loss to petitioner;[4] and in such case its basis, in the property acquired, is its then fair market value. *Mary Kavanaugh Feathers*, 8 T. C. 376; *Fairmount Foundry, Inc.*, 42 B. T. A. 1087; *Commissioner* v. *Mesta*, 123 Fed. (2d) 986; *John H. Wood Co.*, 46 B. T. A. 895; *Commissioner* v. *Spreckels*, 120 Fed. (2d) 517.

There is no essential difference between this situation and one involving basis. In *First National Bank, Philipsburg*, 43 B. T. A. 456,

---

[4] The receipt of pledged property in satisfaction of pledge is not an exchange. *Bingham* v. *Commissioner*, 105 Fed. (2d) 971.

we held that stock, collateral to a loan, taken over by the payee, had a basis (upon later sale) of the value at time taken over, and not the amount of the notes, and this regardless of the fact that for the year when the collateral was taken over the loss taken gave no tax benefit, because the taxpayer had no taxable income. We said: "Thus the value of the shares immediately became their basis, as if they had been purchased for that amount." To the same effect see *Herbert N. Fell*, 18 B. T. A. 81, holding that the fair market value, at time of foreclosure thereon, of hypothecated stocks and bonds, was the basis, not only for determining the loss then taken on the indebtedness secured, but the cost upon which to compute gain or loss upon subsequent disposition. In reversing this case the Court of Appeals in *Federal National Bank of Shawnee* v. *Commissioner, supra*, twice refers to basis, stating first that the Commissioner "did not find the amount of the consideration paid by the taxpayer for the assignment of the policy nor the cost basis of the policy to the taxpayer * * *," also that the Tax Court should have held the deficiency arbitrary and the determination invalid, and that upon appropriate application it "should have heard evidence to establish the cost basis to the taxpayer and the correct amount of the tax." Under the above cases, the respondent has now, in our opinion, proved the cost basis to the taxpayer as the consideration for the transfer.

The cash surrender value of $1,760 on December 24, 1924, is consistent with the testimony of petitioner's president that on July 10, 1922, the fair market value of all assets transferred to Guaranty State Bank by the Bank Commissioner, including the note, insurance policies and mortgage on Adams' house and "such deficiency judgment as might have been transferred to us by the Bank Commissioner" was not over $10,000.

We conclude that the consideration paid by the petitioner for the insurance policy upon which it realized in 1944 was its cash surrender value. The policy shows on its face that the amount is $1,760. The amount of the premiums paid is not in dispute, nor can the addition thereof to consideration, under section 112 (b) (2) (A), be doubted. We, therefore, add to the $1,760 consideration $4,105 premiums paid after acquisition of title to the policy on December 24, 1924. We do not include premiums paid prior to that time when the policy was held merely as collateral. Such premiums could have been and should have been deducted as business expense. *First National Bank & Trust Co. of Tulsa* v. *Jones*, 143 Fed. (2d) 652. The respondent contends that the premiums should be reduced by $1,187, the amount of dividends he contends were credited on the premiums, after the transfer. Considering the condition of the record before us, we conclude that this reduction of premium should not be allowed. To prove the amount, respondent placed in evidence certified photostatic copies of

three exhibits of the petitioner, in the trial against the insurance company on the policy, without other identification or explanation.[5] Though one of the exhibits bears figures totaling $1,187 contended for by the respondent, we can not be sure what they mean to this case. They appear to indicate cash dividends, some of which drew interest and some of which appear to have been paid, but we are unable, considering the condition of the exhibits and record, so to find. The evidence is, however, definite and we have found that the policy was about May 1930 converted into one paid up from November 10, 1929 to July 30, 1941. Even if the dividends were credited against premiums, thus contributing to the extension of the insurance to July 30, 1941, therefore covering the period when Adams died, March 9, 1941, and permitting recovery under the policy, there appears no reason for deducting such dividends from the amount of premiums paid. We find the consideration paid by the petitioner, $1,760, and the premiums paid, $4,105, a total of $5,865, to be the amount deductible, together with the $4,297.12 expenses of collection, from the $23,942.36 received upon the insurance policy.

In coming to the above conclusions we are not unmindful of the fact that when this case was tried originally there were placed in evidence both the amounts of the premiums paid and the insurance policy showing the cash surrender value and that it would have been possible for us then to have come to the present conclusions. The case, however, was not pleaded, tried or briefed or in any wise presented on the present theory, which was presented by neither petitioner nor respondent. The petitioner (though in the return it claimed that the insurance recovery did not constitute income and stated only that it was collateral and that the bank had charged off various amounts of the loans, without tax benefit) at the earlier trial contended for a loss of $183.16 over the net $19,645.24 received from the policy because of a "claimed basis in the policy" of $19,828.40 because of $10,000 paid-in surplus lost, $5,820.40 insurance premium paid, and $4,000 release of mortgage, and the respondent, in effect, simply took the view that the petitioner had the burden of so proving. The view now presented by the respondent that the consideration is the base at time of transfer of policy was not then presented. After much study of this interesting question we think it is sound.

---

[5] Though these exhibits appear to be copies of insurance company records on this policy, covering dividends, they are not so identified and we can not so assume. The record here *does not contain the facts set forth in New York Life Ins. Co. v. Federal Natl. Bank,* 143 Fed. (2d) 69, between this petitioner and a third party, and we can not find them. Thus we are unable to find that the policy was on November 10, 1929, encumbered by a loan of $2,940, or if so, whether such loan was taken out by the bank, or by Adams previous to the bank's acquisition of the policy, though there is some indication that it was not the latter situation, for petitioner's president testified that at July 15, 1922, there was not, to his knowledge, a loan on the policy. *Funk v. Commissioner,* 163 Fed. (2d) 796; *Divide Creek Irr. Dist.* v. *Hollingsworth,* 72 Fed. (2d) 859.

Since, however, the $23,942.36 is shown by the record to consist of $20,000 principal and $3,942.36 interest [6] it is obvious and we find that, aside from the above discussed principal question involving the entire proceeds, the $3,942.36 interest is income to the petitioner. Section 22 (a) of the Internal Revenue Code. *Kieselbach* v. *Commissioner*, 317 U. S. 399. It is equally obvious that from that amount should be deducted the expense of collecting such interest. Since we have found that the entire expense of collection on the policy was $4,297.12, as contended by the petitioner and allowed in the deficiency notice, we prorate that amount and allocate 3,942.36/23,942.36ths, or $707.50, to be deducted from the interest collected. This, of course, does not change the result from our conclusion above on the entire matter.

The petitioner however, as above stated, takes, in effect, the view that the respondent has such a burden of proof that though he has shown the consideration above found he has not met that burden of proof because he has not shown the entire consideration. Though, as above stated, it is our view that the cash surrender value is the full consideration for the transfer of the policy by Adams, we think that in any event the respondent has made a *prima facie* showing and that the petitioner can not urge that there is further consideration without demonstrating what it is. The Court of Appeals in reversing this case did not say that such a burden was upon the respondent; nor did *Helvering* v. *Taylor*, 293 U. S. 507, nor any case, of which we are cognizant, upon this subject. Thus *Wilson Coal Land Co.* v. *Commissioner*, 87 Fed. (2d) 185, though citing *Helvering* v. *Taylor*, *supra*, holding that the presumption that the Commissioner's determination was correct was no longer conclusive when the taxpayer offered evidence to show that it rested upon a false foundation and that the Board was obliged to consider it even though the taxpayer had failed to prove the correct amount of the tax or to show that none was assessable, nevertheless in reversing ordered the Board to consider "such additional evidence as the parties may offer, in order that the facts necessary to a correct decision of the controversy may be determined." In *Commissioner* v. *Kellogg*, 119 Fed. (2d) 115, though the Circuit Court of Appeals found that the Commissioner's determination was without rational foundation and excessive, citing *Helvering* v. *Taylor*, *supra*, the case was remanded "for the purpose of receiving further evidence from the taxpayer and the Commissioner, if such be offered * * * and if such evidence be offered, redetermine the deficiency if any." In the recent case of *Marx* v. *Commissioner*, 179 Fed. (2d) 938, the Court says: "In the second place an arbitrary de-

---

[6] The $3,942.36 is the amount allowed in the judgment as 6 per cent interest from April 30, 1941, that is, for the period of litigation.

termination of deficiency by the Commissioner is not void and therefore a nullity." In *National Lumber & Tie Co.* v. *Commissioner*, 90 Fed. (2d) 216, the Circuit Court of Appeals, Eighth Circuit, held that the taxpayer's evidence showed Commissioner's determination was arbitrary and excessive, but as to remand the Court stated:

We think the Board of Tax Appeals should, under the peculiar facts here existing, have afforded the taxpayer an opportunity of showing if he could what part of the levee taxes paid were assessed against local benefits of a kind tending to increase the value of the property assessed.

\* \* \* \* \* \* \*

The case is, however, remanded to the Board of Tax Appeals, with directions to give to the taxpayer an opportunity of showing, if he can, what part of the levee taxes paid were assessed against local benefits of a kind tending to increase the value of the property assessed within the meaning of the revenue acts.

In *Durkee* v. *Commissioner*, 162 Fed. (2d) 184, the Circuit Court reversed and set aside the deficiency assessment, relying upon the rule that an arbitrary or excessive determination does not require the Commissioner's ruling to be upheld and that in the Tax Court it was sufficient to show that the Commissioner's determination is invalid. Upon remand the petitioner declined to adduce any evidence and, as here, took the position that the burden was upon the respondent under the *Taylor* case. We held in a Memorandum Opinion entered August 15, 1949, reviewing the *Taylor* case and others, that the petitioner was not relieved from all burden of proof and that the respondent's evidence established at least a *prima facie* case, that the *Taylor* case required no more, and that the petitioner could not after such evidence decline to proceed to meet such showing. Upon second appeal, by the petitioner, the United States Court of Appeals, Sixth Circuit, in *Durkee* v. *Commissioner*, 181 Fed. (2d) 189, affirmed "upon the grounds and for the reasons set forth in the opinion of the Tax Court entered August 15, 1949." Assuming, therefore, that the history of the Adams policy while held by petitioner and its predecessors as collateral, prior to the complete assignment on December 24, 1924, is evidential on the question of further consideration for the transfer of such policy on that date (which however, as above stated, we do not consider to be sound law), in our opinion the petitioner after the *prima facie* showing made by the respondent had the burden of going forward to adduce such evidence, and the theory of complete burden upon the respondent did not excuse it. That this might have been difficult is peculiarly immaterial in this case where records were destroyed by the petitioner while the matter was before this Court and after the original trial. In reversing this case the Court of Appeals, 180 Fed. (2d) 494, stated that since the evidence is in the possession of the taxpayer, it may be required to produce such evidence. The record before us is altogether convincing that the respondent

has made every effort to produce such evidence, without avail because of destruction of the records as to the Adams loan and policy during the pendency of this matter, and that the best available evidence was produced. *Cohen* v. *Commissioner*, 176 Fed. (2d) 394. Failure to keep records is not an escape from taxation. *Miller Saw-Trimmer Co.*, 32 B. T. A. 931; *Herndon* v. *Commissioner*, 175 Fed. (2d) 55; *Hoefle* v. *Commissioner*, 114 Fed. (2d) 713. Section 54 of the Internal Revenue Code required the petitioner to keep records and Regulations 111, Section 29.54–1, issued under the specific authority of Section 54 (b), required the petitioner to keep such records "so long as the contents thereof may become material in the administration of any internal-revenue law." These records were destroyed in the face of the law. Moreover, under *Cohan* v. *Commissioner*, 39 Fed. (2d) 540, a taxpayer "whose inexactitude is of his own making" is to be charged therewith. Surely this idea covers the case of a petitioner which, rather remarkably, destroys, during the pendency of a case, after trial and prior to opinion, the records pertinent thereto and of course pertinent to any retrial. Justice would not be subserved by allowing a taxpayer to escape taxation by such ineptitude. The respondent could in no event be expected to make proof of records so disposed of. Though the respondent placed on the stand the petitioner's president in an effort to show the facts, no information in lieu of such records, was obtained from him. We hold that the respondent was not required to adduce more evidence than was presented by him.

*Decision will be entered under Rule 50.*