> *Decisions in all dockets will be entered under Rule 50.*

EFRAIN T. SUAREZ AND ZENAIDA SUAREZ, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4196–67.    Filed August 10, 1972.

*Martin J. Nash*, for the petitioners.
*Glen W. Gilson II*, for the respondent.

HOYT, *Judge:* The respondent has determined the following deficiencies in the petitioners' income tax and has imposed the following penalties:

| Taxable year ended | Deficiency | Penalty (sec. 6653(a)) |
|---|---|---|
| Dec. 31, 1963 | $354,959.96 | $17,748.00 |
| Dec. 31, 1964 | 358,649.62 | 17,932.48 |

The petitioners filed several motions in advance of trial in which they alleged that the respondent based his determination upon evidence which was obtained from them in violation of their rights under the United States Constitution.[1] A hearing was held on these motions at Miami, Fla., and, subsequently, briefs were filed by the parties relating to the issues presented.

Basically, the motions present the issues of (1) whether fourth amendment protections[2] are applicable in a civil tax proceeding, (2) whether the evidence employed by the respondent in making his determination was obtained as the result of an unreasonable search and seizure, and (3) whether the existence of constitutionally tainted evidence affects the respondent's determination and the proceedings in this Court relating thereto. Additionally, we must consider what effect, if any, should be given herein to a prior determination of the U.S. District Court for the Southern District of Florida in a habeas corpus proceeding involving the petitioner, Efrain T. Suarez.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits thereto are incorporated herein by this reference.

The petitioners, Efrain T. Suarez and Zenaida Suarez, husband and wife, resided at 2710 Natoma Street, Miami, Fla., when they filed the

---

[1] Five motions are considered herein. They are outlined in our Findings of Fact.

The respondent has agreed that for the purposes of this case, this Court may properly consider the petitioners' motion to suppress evidence in advance of the trial. On brief, he states:

"there is no rule of the Tax Court or even a rule of the Federal Rules of Civil Procedure which provides for a procedure under which motions to suppress evidence are heard prior to the trial of the case. * * * In our view, normally the proper time for the Court to pass upon the admissibility of evidence is when it is offered at the trial. * * *

\* \* \* \* \* \* \*

"Nevertheless, the respondent has construed the hearing on petitioners' motions as in effect a hearing under Rule 28 of the Tax Court's Rules of Practice. Since respondent has stipulated that he intends to rely upon the seized appointment records with leads derived therefrom, respondent, under these circumstances and only for purposes of this case, agrees that the Court may pass upon at this time the use by respondent at the trial of the case of the records here involved. Were it not determined at this time that respondent would definitely rely upon such records in support of his determination it would be premature at this time for the Court to consider the admissibility of such records."

While we express no opinion as to the soundness of these conclusions, we note that where constitutional issues are presented, consideration of these issues in advance of trial may be necessary. We have considerable discretion with respect to the manner in which we accord and conduct a hearing into such questions. See *Alderman* v. *United States*, 394 U.S. 165, 185 (1969); *Nardone* v. *United States*, 308 U.S. 338, 342 (1939).

[2] As to fifth amendment protections, see fn. 13 *infra*.

petition herein. They filed joint Federal income tax returns for the years 1963 and 1964 with the district director of internal revenue, Miami, Fla.

In early 1964, an information was returned against Efrain and several other individuals, charging them with conspiracy to perform an abortion and charging Efrain with an attempt to procure a miscarriage of a woman, which alleged crimes are felonies under Florida law. (See Fla. Stat. Ann., secs. 797.01 and 775.08.[3])

These charges grew out of a raid conducted on January 3, 1964, by officials of the State attorney's office of Dade County, Fla., and of the City of Miami, Fla. The raid took place at the premises of the Ayala Clinic. The parties have stipulated that Efrain has standing to contest the legality of the search and seizure of evidence following his arrest as a result of the aforementioned raid.

In the middle of November 1963, the City of Miami Police Division and the State attorney's office decided that they would try to make a case against the Ayala Clinic. An investigation took place for a period of 4 to 6 weeks prior to the raid.

A general plan for the raid was developed, and two policewomen were enlisted to assist—Barbara Williams and Myrtle Ellison. Barbara came to Miami on December 27, 1963, and she received instructions from representatives of the State attorney's office. She was told to go to Tampa, Fla., and call the clinic to make an appointment for an abortion.

Barbara contacted the Ayala Clinic on December 28, 1963, and made another call on January 2, 1964. She was able to make an appointment with Efrain to have an abortion performed on the morning of January 3, 1964. The price for the scheduled abortion was to be $1,000.

After making the appointment, Barbara contacted the State attorney's office. She returned to Miami on the evening of January 2, 1964. In Miami, she executed an affidavit as requested by Arthur Huttoe, assistant State attorney. At that time in order to review the arrangements for the raid, she met with Glen L. Baron, assistant chief of the Miami Police Department, Michael Daugherty, special investigator from the State attorney's office, and Malcolm E. Gracey of the Miami Police Department, the commanding officer of the Internal Security Squad. Also present at this meeting was Myrtle Ellison. The participants discussed the general plans for the raid that had been formulated.

As part of the plan, both policewomen—Barbara and Myrtle— would enter the premises of the Ayala Clinic and after money was paid over and arrangements made for the abortion, Myrtle would step out-

---

[3] See fns. 20 and 21 *infra.*

side the building as a signal for the raiding officers to enter the building and make the arrests. In the event that the raiding officers were unable to get into the clinic, the participants agreed that Barbara would arrest the doctor who was to perform the abortion before he commenced the medical procedure.

Barbara was a trained policewoman and had received normal police recruit training, including judo technique. She knew that the police officers would be at the back door of the Ayala Clinic, as well as at the front door. She knew that, when Myrtle left the clinic building, the raiding officers would enter, and that Myrtle's departure from the building would be a signal that the money had been paid over and the abortion was about to be performed.

A female informant had given information to Barbara as to the floor plan of the clinic, and Barbara had received a diagram. In addition, she was told that a person inside the clinic would place a bar across the door. Barbara advised the raiding officers of what she had been told by the informant.

Barbara was also aware that patients receiving abortions were put to sleep with an injection. She advised Daugherty that, as part of the "abortion procedure," she "would be there for a period of an hour or two and would get a needle, and it would be all over and she could leave in a couple of hours."

The raiding officers, prior to the raid, had investigated Efrain for attempted abortion. They had received information that Efrain was operating the Ayala Clinic (previously run by Dr. Ayala) and that he was using the cards and letterheads of the Ayala Clinic. The raiding officers had also read affidavits from people in New Jersey, who stated they had been to the clinic for abortions. In addition, Barbara executed an affidavit stating that she had contacted a person in the clinic for the purpose of obtaining an abortion.

The persons who actually took part in the raid on the clinic on January 3, 1964, were Chief Baron, Gracey, Daugherty, Detective Jack Elmore, Barbara, and Myrtle.

On the morning of January 3, 1964, the plan devised by the State attorney's office and the Miami police was implemented. Barbara was given $1,000. The serial numbers on these bills were read off by Chief Baron. Gracey and Myrtle recorded the numbers. Then Barbara and Myrtle were driven to the Ayala Clinic.

The raiding party proceeded to follow their prearranged plan. Each of the raiding officers, including the policewomen, intended to arrest everyone in the clinic on abortion charges or on charges of conspiracy to commit abortion. However, the raiding officers had neither an arrest warrant nor a search warrant.

In carrying out her roles in the raid plan, Barbara "intended to go as far as necessary." If the other officers were unable to arrest Efrain, she would arrest him herself if he started the abortion or attempted to give her an injection.

Barbara and Myrtle entered the clinic at 8 a.m. on January 3, 1964, through an unlocked public front door which was marked "open." The front door opened into a waiting room. Above the front door was a sign on which Efrain's name appeared.

Gracey, Daugherty, and Baron parked about a block away. The police officers remained on station during the time that the policewomen were in the clinic.

Barbara rang a bell which was located in the waiting room near an inner door. After she rang the bell, Barbara and Myrtle could hear a key unlocking the inner door. This inner door had a steel bar across it on the inside.[4] In addition, it had a two-way mirror and a peephole. Efrain entered the waiting room after opening the door and met the policewomen. He then took them through the same door and relocked it, replacing the steel bar.

Inside the clinic, Efrain left Myrtle in another waiting room and took Barbara to an examination room where he examined her. Then in Myrtle's presence, Efrain took the $1,000 from Barbara. (This money, the serial numbers of which had been recorded, is hereinafter referred to as the marked money.) Efrain told Barbara, also in Myrtle's presence, that he would give her a shot with a needle. Barbara stated that she did not want the shot since she could stand the pain. After receiving the marked money, Efrain asked Barbara to get undressed. Myrtle told Efrain she was leaving to get breakfast and would return.

Myrtle then attempted to leave by the door through which she entered. She removed the steel bar but was still unable to open it. After about a minute of shaking the door, Efrain came up behind her and unlocked it. As she left, she could hear the inner door being relocked.

After Myrtle left, Barbara went into a bathroom to "undress." Barbara was not armed and had nothing with her to identify her as a policewoman.

The policewomen were in the clinic for between 20 to 25 minutes before Myrtle came out.

Myrtle signaled to the other officers who came to the front of the clinic. Myrtle told the raiding officers that Barbara was inside, that the money had passed hands, and that Barbara was about to receive an injection.

---

[4] At the time of the raid, all of the officers knew about this bar.

Daugherty, Chief Baron, Gracey, and Mytle went through the public street door and knocked on the closed inside door off the public waiting room. They received no response. They immediately knocked again and announced that they were police officers and were from the State attorney's office, and they said: "Open up." They heard no sounds coming from the clinic. Myrtle told them to hurry, repeating that Efrain was going to give Barbara a shot. They waited for 15 to 30 seconds, and when they received no response, they knocked one more time. Then they proceeded to break the door down. No announcement of purpose was made by the raiding officers.

The officers broke down the inside door and entered the clinic in order to arrest Efrain and others in the building and to obtain evidence of their suspected crimes. There was considerable confusion as they made their entry. Barbara was still in the bathroom and could hear the ensuing commotion.

Once in the clinic, Daugherty and Gracey saw Efrain coming toward them down the hallway. They arrested him and told him to sit on a couch in the front room. While Gracey secured Efrain, Daugherty attempted to find Barbara. He located her when he kicked in the locked bathroom door (an act which startled her). Daugherty then continued to search the clinic to arrest other persons employed there.

In the meantime, Gracey was looking for the marked money. He searched Efrain but could not find it on his person. He then began a search of the clinic to locate the money.

A short time later, Daugherty requested that Efrain open a wall safe discovered by Elmore. When Daugherty indicated he would open it with a sledge hammer if Efrain would not comply, Efrain opened the safe. Papers removed therefrom were placed in Gracey's custody.

One of the clinic's female employees disappeared after Efrain was arrested, and the raiding officers had to make a search to locate her. She was found in a room which she had entered through a trapdoor located in a broom closet.

Chief Baron had stayed outside the building until he was relieved by a uniformed police officer. He then entered the building. The names of the people arrested were then being taken down. Gracey was with Efrain and with women who had been arrested by the raiding officers. Daugherty returned to the front room area, where the people who had been arrested were seated, and he proceeded to assist Chief Baron and Gracey.

While searching for the marked $1,000, Gracey seized 41 pages of Efrain's daily records, with names and dates on them (hereinafter

referred to as the disputed records), from the office portion of the clinic.[5] Two of the 41 sheets of disputed records were found on top of Efrain's desk and the other sheets, not in plain view, were found in his desk. These records were seized within minutes after Efrain was arrested. The marked money had not yet been located. The search of the Ayala Clinic to find the marked money was conducted for at least 2 hours.[6]

The raiding officers searched a chair on which Efrain had been sitting and seized $2,650 in cash in a paper bag under the cushion. Included in this amount was the marked $1,000.

During this search of the entire clinic, the raiding officers seized, as evidence, various medical instruments and supplies, promissory notes, jewelry, car titles, the disputed records, and $2,650 in currency, including the marked $1,000. No evidence was seized from the room off the broom closet. All of the seized evidence was taken only from the clinic.

When Daugherty returned to his office the day of the raid, he had in his custody the daily records seized at the Ayala Clinic. Upon his return he was advised of a telephone call that had been received from the Internal Revenue Service. He returned the call and arranged a meeting with representatives of the Internal Revenue Service, which was held 3 or 4 days later. At that time, Daugherty made available to the Revenue Service representatives copies of the daily records (i.e., the disputed records) that had been taken from the clinic in the January 3, 1964, raid. The parties have stipulated that these daily records, together with leads derived therefrom, are the sole basis for respondent's determination contained in the statutory notice of deficiency for 1963 and 1964.

The Internal Revenue Service investigation was instituted by the Revenue Service's Intelligence Division. The revenue agent's report in this case was made by Agent John Mierow, who first obtained knowledge of the raid on the clinic 2 or 3 days later from the newspapers or news media.

In May of 1964, Efrain's motion to suppress certain evidence taken at the raid was heard and denied by the Criminal Court of Record in and for Dade County, Fla.

Efrain's criminal case was tried in the said court in January of 1965. The jury returned a verdict of guilty on two counts of the information against Efrain, charging conspiracy to commit abortion and attempted abortion. He then took an appeal to the Third District

---

[5] Barbara saw her name on one page of these disputed records, but she could not recall whether it was before or after the raid.

[6] During the course of this search, the raiding officers observed that windows and doors in the clinic were covered with aluminum foil or film.

Court of Appeals of the State of Florida. That court affirmed the attempted abortion conviction. See *Rodriguez* v. *State*, 189 So. 2d 656 (Fla. App. 1966).

In June of 1966, Efrain filed a petition for a writ of certiorari in the Supreme Court of the State of Florida. On February 14, 1967, that court denied the petition for lack of jurisdiction.

A petition for a writ of certiorari was filed in the Supreme Court of the United States in its October 1967 term. That petition was denied.

On May 2, 1968, a petition for a writ of habeas corpus was filed in the Supreme Court of Florida on Efrain's behalf, which petition was subsequently denied.

A petition for a writ of habeas corpus was filed and granted by the U.S. District Court for the Southern District of Florida in August 1969. The District Court observed that the raiding officers announced only their identity and not their purpose when they broke into the Ayala Clinic. The court's order states "that no exigency existed which excused the making of the other half of the [constitutionally required] announcement" and that "the entry of the officers into the clinic was illegal and the motion to suppress the evidence obtained thereafter should have been granted." The court concluded that the finding of the State court was not fairly supported by the record and ordered "that the judgment of conviction be vacated and a new trial granted to the petitioner within a reasonable time or the petitioner set free."

Subsequent to the order of the Federal District Court, the Criminal Court of Record of Dade County, Fla., ordered on May 22, 1970, "that the State of Florida, its attorneys, investigators, agents, agencies, and representatives, and any parties in privity with any of them, be and they shall forthwith return to the within Defendant, Efrain T. Suarez, * * * all books, records, papers, documents and other items seized, and any and all copies of the same."

On January 8, 1968, the petitioners filed a motion in this Court, requesting that affirmative allegations of the respondent's amended answer be stricken and that judgment on the pleadings be entered. On May 20, 1968, the respondent moved to continue a hearing on the motion on the grounds that it was premature because of pending collateral attacks on Efrain's conviction. The continuance was granted. By joint motion of the parties, two additional continuances were granted. The trial of the case was then set for June 8, 1970.

On June 5, 1970, Judge Mehrtens, U.S. District Court Judge, Southern District of Florida, issued a temporary restraining order prohibiting the Internal Revenue Service from using the records seized in the raid on the clinic in any criminal or civil proceeding; this was done for the purpose of holding the problem in status quo until a full hearing could be held on the matter.

On June 8, 1970, when this case was called from the trial calendar at Miami, hearing on all pending motions was set for June 12, 1970, to be followed by trial thereafter.

On June 11, 1970, a full hearing was held in the U.S. District Court at which Judge Mehrtens dissolved the temporary restraining order against the Internal Revenue Service "because the plaintiffs have an adequate remedy at law in the Tax Court."

Petitioners' motions filed in this case were heard on June 12, 1970. The motions are as follows:

1. Motion to Strike the Affirmative Allegations of the Amended Answer and Judgment on the Pleadings;

2. Motion to Strike and Suppress Evidence and to Quash Subpoenas and Subpoenas Duces Tecum; [7]

3. Motion to Quash the Statutory Notice of Deficiency and to Dismiss for Lack of Jurisdiction;

4. Motion to Return Property; and

5. Motion to Shift Burden of Proof.[8]

After testimony was taken and other evidence was admitted, the motions were taken under advisement and briefs were ordered to be filed.

In his Motion to Strike the Affirmative Allegations of the Amended Answer and Judgment on the Pleadings, Efrain points out the respondent's admission in his amended answer that the deficiences in income taxes determined against Efrain for the years 1963 and 1964 were based upon information and leads obtained from records seized in a raid on January 3, 1964. Efrain contends that the said records were taken from him in a search and seizure which violated his constitutional rights. Efrain moves that the affirmative allegations made in the respondent's amended answer (based on information and leads from the said records) be stricken and that the Court hold for petitioners on the pleadings.

In his Motion to Strike and Suppress Evidence and to Quash Subpoenas and Subpoenas Duces Tecum, Efrain states that the respondent based his determination in the statutory notice upon evidence which was taken from Efrain in a search and seizure which violated his constitutional rights, and the motion maintains:

Evidence to be submitted by the Internal Revenue Service at the trial based solely upon the fruits of an illegal search and seizure should be suppressed and all Subpoenas directed to individuals (unknown to Petitioners) ascertained from leads obtained in said search should be quashed.

In his Motion to Quash the Statutory Notice of Deficiency and

---

[7] We are not considering herein a similar motion filed by Stanley J. Bartel, Esq., which the parties stipulated would be heard, if necessary, when the trial resumes.

[8] Our discussion herein will be limited to the constitutional grounds stated in the motion.

to Dismiss for Lack of Jurisdiction, Efrain states that the respondent based his determination in the statutory notice upon evidence which was taken from Efrain in a search and seizure which violated his constitutional rights and that the statutory notice is therefore a direct product of such evidence and leads obtained therefrom. Efrain moves that the notice be quashed and stricken and that the Court thereupon dismiss this cause for lack of jurisdiction.

In his Motion to Return Property, Efrain states that the respondent based his determination in the statutory notice upon copies of records which were taken from Efrain in a search and seizure which violated his constitutional rights. Efrain states that he has made demand upon officials of the Internal Revenue Service to return the copies in their possession, and he moves that the Court order their return.

In his Motion to Shift the Burden of Proof, Efrain states that the respondent based his determination in the statutory notice upon evidence which was taken from Efrain in a search and seizure which violated his constitutional rights. Efrain concludes that the statutory notice thereby has lost its presumption of correctness, and he moves that the Court hold the respondent has the burden of proof to establish allegations in the notice.

OPINION

We are confronted herein with an important and fundamental question: To what extent are the prohibitions against unreasonable searches and seizures enunciated in the fourth amendment to the United States Constitution applicable in a civil tax proceeding? It is a significant question and one of first impression in this Court.

The fourth amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

It has been clearly established that evidence seized in violation of a defendant's rights under the fourth amendment (or under the 14th amendment, where the States are involved) will be excluded in a criminal trial, whether that trial be in a State or Federal court and whether the evidence was seized by Federal or State officials. *Ker* v. *California*, 374 U.S. 23 (1963); *Mapp* v. *Ohio*, 367 U.S. 643 (1961); *Elkins* v. *United States*, 364 U.S. 206 (1960); *Weeks* v. *United States*, 232 U.S. 383 (1914). This exclusionary rule bars not only the evidence itself but all leads obtained therefrom, *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 (1920), and it applies to exclude evidence

illegally obtained by State officials and made available to Federal officials, *Elkins* v. *United States, supra.*

The Supreme Court has applied the exclusionary rule in civil proceedings which had criminal overtones or involved forfeitures. *See* v. *City of Seattle*, 387 U.S. 541 (1967) ; *Camara* v. *Municipal Court*, 387 U.S. 523 (1967) ; *Boyd* v. *United States*, 116 U.S. 616 (1886).

Thus far, the high court has not faced the exact issue presented herein. But it has repeatedly stated that the rule's purpose is to deter unconstitutional conduct, and its prior opinions, as well as decisions by other Federal courts, clearly delineate the path we should follow. Thus, in *Weeks* v. *United States, supra,* the Court, in commenting on the scope of protection afforded by the fourth amendment, stated (232 U.S. at 392) :

This protection reaches all alike, *whether accused of crime or not,* and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws. [Emphasis added.]

In *Silverthorne Lumber Co.* v. *United States, supra,* a criminal case extending the protection of the amendment to a corporation, the Court stated (251 U.S. at 392) :

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that *it shall not be used at all.* [Emphasis added.]

Subsequently, the Court, in *Elkins* v. *United States, supra,* noted (364 U.S. at 217) :

The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

And in *Camara* v. *Municipal Court, supra,* which involved a warrantless search pursuant to the San Francisco Housing Code, the Court said (387 U.S. at 530) :

we cannot agree that the Fourth Amendment interests at stake in these inspection cases are merely "peripheral." It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.[6] [Fn. omitted.]

The foregoing statements are a reflection of the view stated for the Court by Mr. Justice Butler some 40 years ago, that :

The Amendment is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted. [See *Go-Bart Co.* v. *United States,* 282 U.S. 344, 357 (1931).]

The Court of Appeals for the Second Circuit faced the question of the fourth amendment's applicability in a civil tax case in *Pizzarello* v. *United States,* 408 F. 2d 579 (C.A. 2, 1969). That case involved a tax-

payer's action to enjoin a levy of a jeopardy assessment for unpaid wagering taxes on money illegally seized by the Government. In reversing an order of the District Court denying the injunction, the court said (p. 586) :

This case, however, while civil in nature is not between private parties and there are no analogous independent deterrents to, or remedies against, government violations of the Fourth Amendment. The prohibition against unreasonable searches and seizures is directed at governmental action. Absent an exclusionary rule, the Government would be free to undertake unreasonable searches and seizures in all civil cases without the possibility of unfavorable consequences. In such a situation, while the matter has not been settled by Supreme Court decision, it seems clear, even under a view of the law most favorable to the Government, that evidence so obtained would be excluded. Because Pizzarello's tax assessment was based in substantial part, if not completely, on illegally procured evidence, the assessment is invalid.

In *United States* v. *Blank*, 261 F. Supp. 180 (N.D. Ohio 1966), the District Court applied the fourth amendment exclusionary rule and directed that illegally seized evidence be destroyed (contraband) or returned (noncontraband) to a taxpayer who was threatened with a tax assessment. In so holding, it reasoned (p. 182) :

Where, as here, there is a correlative civil action open to the Government which imposes a penalty upon the citizen commensurate with the criminal sanctions to which an accused, victimized by an illegal search, would be exposed, then we see no distinguishable difference between the two forms of punishment which excuses the government from complying with constitutional mandates when prosecuting their action in a civil forum. * * *

See also the dissenting opinion of Mr. Justice Brennan in *Abel* v. *United States*, 362 U.S. 217, 254–256 (1960).

Other Federal courts have indicated similar views. *Knoll Associates, Inc.* v. *F.T.C.*, 397 F. 2d 530 (C.A. 7, 1968) (stolen documents could not be used by the Government in an FTC proceeding) ; *Powell* v. *Zuckert*, 366 F. 2d 634 (C.A. D.C. 1966) (discharge of a Government civilian employee) ; *Berkowitz* v. *United States*, 340 F. 2d 168 (C.A. 1, 1965) (forfeiture) ; *District of Columbia* v. *Little*, 178 F. 2d 13 (C.A. D.C. 1949), affirmed on other grounds 339 U.S. 1 (1950) (housing code violation) ; *United States* v. *Physic*, 175 F. 2d 338 (C.A. 2, 1949) (forfeiture) ; *United States* v. *Butler*, 156 F. 2d 897 (C.A. 10, 1946) (forfeiture) ; *Walker* v. *United States*, 125 F. 2d 395 (C.A. 5, 1942) (forfeiture) ; *Rogers* v. *United States*, 97 F. 2d 691 (C.A. 1, 1938) (civil action to recover import duties) ; *Laprease* v. *Raymours Furniture Co.*, 315 F. Supp. 716 (N.D. N.Y. 1970) (action to enjoin a replevin) ; *State of Iowa* v. *Union Asphalt & Roadoils, Inc.*, 281 F. Supp. 391 (S.D. Iowa 1968), affirmed sub nom. *Standard Oil Company* v. *State of Iowa*, 408 F. 2d 1171 (C.A. 8, 1969) (treble damage antitrust action) ; *United States* v. *Stonehill*, 274 F. Supp. 420 (S.D.

Cal. 1967), affd. 405 F. 2d 738 (C.A. 9, 1968) (enforcement of tax lien) ; *Lord* v. *Kelley*, 223 F. Supp. 684 (D. Mass. 1963) (action to enjoin evidentiary use of illegally seized records) ; *United States* v. *One 1963 Cadillac Hardtop*, 220 F. Supp. 841 (E.D. Wis. 1963) (forfeiture) ; *Lassoff* v. *Gray*, 207 F. Supp. 843 (W.D. Ky. 1962) (action to enjoin tax assessment) ; *United States* v. *$4,171.00 in United States Currency*, 200 F. Supp. 28 (N.D. Ill. 1961) (forfeiture) ; *United States* v. *Costello*, 145 F. Supp. 892 (S.D. N.Y. 1956), reversed on another issue 247 F. 2d 384 (C.A. 2, 1957), which was in turn reversed on such other issue 356 U.S. 256 (1958) (denaturalization proceeding) ; *Tovar* v. *Jarecki*, 83 F. Supp. 47 (N.D. Ill. 1948), reversed on other grounds 173 F. 2d 449 (C.A. 7, 1949) (action to enjoin tax collection) ; *Schenck* v. *Ward*, 24 F. Supp. 776 (D. Mass. 1938) (immigration proceeding) ; *Ex Parte Jackson*, 263 F. 110 (D. Mont. 1920) (deportation proceeding). But cf. *Walder* v. *United States*, 347 U.S. 62 (1954) (use of illegally seized evidence for impeachment purposes in criminal proceeding) ; *United States* v. *Schipani*, 435 F. 2d 26 (C.A. 2, 1970) (use of wiretap evidence in sentencing) ; *United States ex rel. Sperling* v. *Fitzpatrick*, 426 F. 2d 1161 (C.A. 2, 1970) (parole revocation proceeding) ; *N.L.R.B.* v. *South Bay Daily Breeze*, 415 F. 2d 360 (C.A. 9, 1969), certiorari denied 397 U.S. 915 (1970) (labor proceeding) ; *Compton* v. *United States*, 334 F. 2d 212 (C.A. 4, 1964) (impeachment purposes in tax assessment proceeding).

See also the annotation, "Admissibility, In Civil Case, of Evidence Obtained by Unlawful Search and Seizure," 5 A.L.R. 3d 678–683, and 5 A.L.R. 3d 13–14 (1971 supp.).

In *United States* v. *Chase*, a 1966 opinion of the District Court for the District of Columbia, unofficially reported at 67–1 U.S.T.C. par. 15,733, the court stated :

It is clear that the protections of the Fourth Amendment against unreasonable search and seizure are not strictly bounded by the confines of the criminal law, but extend to certain civil proceedings. *Boyd* v. *United States*, 116 U.S. 616 (1886) ; *Berkowitz* v. *United States*, 340 F. 2d 158 (1st Cir. 1965) ; *Lassoff* v. *Gray*, 207 F. Supp. 843 (W.D. Ky. 1962), and cases cited at pp. 846–848. [Footnote omitted.] See also Annotation, "Admissibility in Civil Case of Evidence Obtained by Unlawful Search and Seizure," 5 ALR 3d 670, 678–83 (1966).

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

There is no question here but that the basis for the Government's tax assessment against Joseph Chase is evidence which it obtained in violation of the Fourth Amendment to the Constitution. There appears to be no sound reason to accord less consideration to "\* \* \* the imperative of judicial integrity" in this proceeding than in the criminal case involving the same parties. The role of "accomplice \* \* \* in the willful disobedience of law" is an unbecoming one for a Federal court—regardless of the nature of the proceedings. See *Elkins* v. *United States*, \* \* \* 364 U.S. at 223, citing *McNabb* v. *United States*, 318 U.S. 332 at 345 (1943).

In *Chase*, the District Court held that a tax assessment based on illegally seized material was not admissible in evidence in a suit brought by the Government to reduce the assessment to a judgment.

We are not unmindful of the competing considerations involved in applying the protection of the fourth amendment. See Amsterdam, "Search, Seizure, and Section 2255: A Comment," 112 U. of Pa. L. Rev. 378, 388–389 (1964).[9] But, the language of the fourth amendment itself admits of no distinction between searches and seizures in the context of a criminal case and those made in the context of a civil case. Indeed, it speaks in terms of the proscribed conduct without any apparent regard to the motivation for such conduct or the use of the fruits thereof. Consequently our recent decisions, dealing with the inapplicability of the inhibitions of the fifth amendment to civil tax proceedings, are distinguishable. *Hugo Romanelli*, 54 T.C. 1448 (1970), on appeal (C.A. 7, Aug. 11, 1970); *John Harper*, 54 T.C. 1121 (1970).[10]

The costs to society of applying the exclusionary rule in civil tax cases are substantially less than in the criminal area where the rule is well established. Surely the lesser objective of civil tax collection should nöt be accorded preferential treatment over the greater objective of convicting the guilty criminal. Moreover, we cannot ignore the additional factor that the integrity of the judicial process is also at stake. See *Mapp* v. *Ohio*, 367 U.S. 643, 659, 660 (1961); *Elkins* v. *United States*, 364 U.S. 206, 222 (1960).

In view of the foregoing, we conclude that any competing consideration based upon the need for effective enforcement of civil tax liabilities (compare *Elkins* v. *United States*, *supra* at 222) must give way to the higher goal of protection of the individual and the necessity for preserving confidence in, rather than encouraging contempt for, the processes of Government. See *Mapp* v. *Ohio*, *supra* at 659, and *Elkins* v. *United States*, *supra* at 223, where the Supreme Court quoted with approval the following from the dissenting opinion of

---

[9] "it will not do to forget that the *Weeks* rule is a rule arrived at only on the nicest balance of competing considerations and in view of the necessity of finding some effective judicial sanction to preserve the Constitution's search and seizure guarantees. The rule is unsupportable as reparation or compensatory dispensation to the injured criminal;[48] its sole rational justification is the experience of its indispensability in 'exert[ing] general legal pressures to secure obedience to the Fourth Amendment on the part of federal law-enforcing officers.'[49] As it serves this function, the rule is a needed, but grudgingly [sic] taken, medicament; no more should be swallowed than is needed to combat the disease. Granted that so many criminals must go free as will deter the constables from blundering,[50] pursuance of this policy of liberation beyond the confines of necessity inflicts gratuitous harm on the public interest as declared by Congress. [Footnotes omitted.]"

[10] The fifth amendment provides that "no person * * * shall be compelled in any *criminal* case to be a witness against himself * * *." (Emphasis added.)

Mr. Justice Brandeis in *Olmstead* v. *United States*, 277 U.S. 438, 485 (1928):

Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. * * * If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy.

We hold that, as a matter of law, the protective rule of the fourth amendment which excludes evidence illegally obtained is applicable in a civil tax case.

We must now consider whether the action taken by the Federal District Court for the Southern District of Florida in the habeas corpus proceeding, discussed in our findings, should have a binding effect on the determination to be made herein regarding the constitutionality of the raid.

Efrain argues that the United States is in privity with the State of Florida and is barred by the principle of collateral estoppel from relitigating the search and seizure issue.[11] We cannot accept this argument. In order for the principle of collateral estoppel to apply, it is essential that there be a preceding final determination by a court, resolving the matter at issue in the present litigation. In *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948), this requirement was discussed as follows (pp. 597–598):

The rule [res judicata] provides that when a court of competent jurisdiction has *entered a final judgment on the merits* of a cause of action, the parties to the suit and their privies are thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." * * * The *judgment* puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. * * *

\*       \*       \*       \*       \*       \*       \*

But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly.

---

[11] On the question of collateral estoppel and privity, see, generally, *Commissioner* v. *Sunnen*, 333 U.S. 591 (1948); *Sutphen Estates* v. *United States*, 342 U.S. 19 (1951); and *Lentin* v. *Commissioner*, 226 F.2d 695 (C.A. 7, 1955), affirming 23 T.C. 112 (1954). See also 46 Am. Jur. 2d, Judgments, secs. 415, 518, and 519.

It seems doubtful to us that the United States and the State of Florida can be considered as privies. No Federal agent or employee participated in the raid, and the Federal Government was not a party to any of the prior criminal litigation. The State of Florida did not represent the interests of the United States in the prior litigation, and the United States did not control or influence the manner in which the State pursued that litigation. The United States had no right to introduce testimony, cross-examine witnesses, or appeal the judgment. While officials of the *same* government may be in privity, we doubt it can be said that officials of *different* governments are privies unless that fact is clearly established by the evidence. Cf. *Sunshine Coal Co.* v. *Adkins*, 310 U.S. 381, 402–403 (1940); *Tait* v. *Western Md. Ry. Co.*, 289 U.S. 620, 627 (1933); and *Guaranty State Bank of Greenville, Tex.*, 12 B.T.A. 543 (1928).

Efrain maintains that the respondent, in earlier hearings before this Court, indicated that he believed the doctrine of collateral estoppel would apply. However, the applicability of the doctrine is dependent upon legal principles and not upon the consistency of the respondent's contentions. We have not been shown how Efrain was put to any disadvantage.

In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, *upon the determination of which the finding or verdict was rendered.*" * * * matters which were actually litigated and *determined* in the first proceeding cannot later be relitigated. * * * In this sense, *res judicata* is usually and more accurately referred to as estoppel by judgment or collateral estoppel. * * *

[Citations omitted. Emphasis added.]

We do not agree with Efrain that the District Court made a determination that the raiding officers acted in an unconstitutional manner when they broke into the Ayala Clinic and that this determination is binding on all courts and on all parties.

The District Court order on its face states that it is based on 28 U.S.C. section 2254(d)(8) and that "the presumption of the correctness of the state court finding stands unless it is not fairly supported by the record." The District Court concluded that the finding by the State court was *not* fairly supported by the record and ordered that a new trial be granted.

Accordingly, it is evident that the District Court order (despite its strong language quoted in our findings) was not a final and binding determination of the constitutionality of the raid.[12] It left open the opportunity for the development of another record on the issue of whether the evidence was illegally seized.

We hold that the District Court order in the prior habeas corpus proceeding does not dictate the determination to be made herein. As a Federal court, we shall make "an independent inquiry" in applying Federal law in order to ascertain "whether there has been an unreasonable search and seizure by state officers." *Elkins* v. *United States*, *supra* at 223–224.

The critical question before us in this case is whether the raid on the Ayala Clinic on January 3, 1964, resulted in a search and seizure which violated Efrain's rights under the fourth amendment to the Constitution.[13]

---

[12] At a subsequent hearing on June 11, 1970, Judge Mehrtens, who issued the habeas corpus order, stated:

"The effect of that order, in my opinion, would not have foreclosed the State, for example, from coming in on a retrial of the case and introducing [additional factors] into evidence * * *. * * * I had no intention of trying to stop them.

*       *       *       *       *       *       *

"You see, * * * what you are arguing is the effect of my holding was that that was an illegal search and seizure under any or all possible circumstances and that there was no way that anybody could make it legal. And I didn't hold that. * * *"

[13] Efrain also argues, without being specific, that the raiding officers violated his rights under the *fifth* amendment to the Constitution. We have held that in a purely civil tax proceeding in the Tax Court, we are unable to consider the merits of arguments based on alleged violations of fifth amendment guarantees. *Hugo Romanelli,* 54 T.C. 1448 (1970), on appeal (C.A. 7, Aug. 11, 1970) ; *John Harper,* 54 T.C. 1121 (1970) ; see also *A. H. Alexander,* 56 T.C. 710 (1971). However, Efrain suggests that the Court of Appeals for the Fifth Circuit, to which the instant case would be appealable, has adopted a different view. Because of the holding herein as to the applicability of *fourth* amendment protections, we need not discuss this question.

The parties are in agreement that, in making their forcible entry into the clinic on the day of the raid, the raiding officers made no announcement relating to the purpose for which they sought entry. The parties are further in accord that (1) an announcement as to purpose is required under the fourth amendment (with certain exceptions) regardless of whether the raiding officers are armed with a search warrant, and (2) in the absence of such an announcement, any arrest or search and seizure of property made during a raid are in violation of rights granted under that amendment. See *Ker* v. *California, supra* at 37–41 (opinion of Clark, *J.*), and at 46–47 and 54–64 (opinion of Brennan, *J.*) ; *Sabbath* v. *United States*, 391 U.S. 585 (1968) ; and *Miller* v. *United States*, 357 U.S. 301 (1958). The Florida Supreme Court has recognized the common law origins of this requirement. See *Benefield* v. *State of Florida*, 160 So. 2d 706 (Fla. 1964). See also Fla. Stat. Ann., sec. 901.19.

It is therefore clear that, unless the officers in the instant case were for some reason excused from making an announcement as to the purpose for the raid, the records at issue herein were obtained as the result of an unreasonable search and seizure.

It is recognized in the authorities which we have cited above that an announcement as to purpose is not required in all instances, and that there are exceptions to the general rule. When the criminal case arising out of the raid was presented on appeal in the Florida courts, it was held that the officers' fear for Barbara's safety excused their failure to announce their purpose. See *Rodriguez* v. *Florida*, 189 So. 2d 656, 660 (Fla. App. 1966). However, we do not agree that the evidence before us supports the officers' contention that their fears for Barbara's well-being began to increase rapidly following their first knock on the inside door of the clinic and that, as a result, they could legally enter the clinic without the requisite announcement.

The respondent admits that there was no direct evidence relating to this question in the earlier State court trial. At the hearing before this Court, therefore, an attempt was made by the respondent to elicit testimony on this point. The testimony did not add much of substance to the record in the State court trial, and in any event, we found it to be less than convincing.[14]

What the record shows is that, after the raiding officers received no response to their first set of knocks and allegedly were becoming more and more anxious, they knocked again. This evidence does not square with a finding that the officers feared for Barbara's safety. If they in fact seriously entertained such a fear, it seems unlikely that they would

---

[14] We do not accord much weight to unsupported testimony, offered for the first time at the hearing in the instant matter, relating to statements made by unidentified informants as to alleged unprofessional conduct by Efrain in treating his patients.

have bothered with repeated knocking. Cf. *United States* v. *Barrow*, 212 F. Supp. 837, 847 (E.D. Pa. 1962).

There is no doubt that the raid was well planned and that the raiding officers knew well in advance the situation into which Barbara would be placed pursuant to their plan. They also knew that before any medical procedure could be commenced and before any needle would be administered, Barbara, an experienced and trained policewoman, would make an arrest. This, too, was part of their plan. We do not believe that the raiding officers intended to place Barbara in a dangerous situation, and we do not believe that the officers, in following their plan on the day of the raid, in fact placed her in a position of jeopardy. We seriously question whether the officers entertained a contrary belief.

We do not regard as credible the testimony of the raiding officers who allegedly had increasing fear for Barbara's safety and suddenly decided Barbara needed to be rescued. Clearly they had ample time within which to make the requisite announcement as to purpose since they delayed from 15 to 30 seconds before breaking the door down. We conclude that Barbara was not in any real peril and that the members of the raiding party in failing to announce their purpose, were not motivated by a concern for her well-being; no exigency existed which excused the raiding party from making the other half of the constitutionally required announcement after they identified themselves at the clinic door.

The respondent further argues that the raiding party did not have to make an announcement as to purpose because Efrain knew their purpose and, therefore, such an announcement would have been a useless gesture.[15] He cites *Wayne* v. *United States*, 318 F. 2d 205 (C.A. D.C. 1963). The respondent's argument in this respect appears to be in the nature of an afterthought, developed at some time subsequent to the raid. The argument does not appear to have been made in any of the prior proceedings arising out of the raid.

In *Ker* v. *California, supra*, a case also involving an unannounced entry, Mr. Justice Clark discussed whether there were grounds for the police to believe that a suspect was expecting them. He stated (374 U.S. at 40, fn. 12) :

It goes without saying that in determining the lawfulness of entry * * * we may concern ourselves only with what the officers had reason to believe *at the time of their entry*. *Johnson* v. *United States*, 333 U.S. 10, 17 (1948).

Mr. Justice Clark further pointed out that a search does not change its character from "what is subsequently dug up."

---

[15] The respondent also suggests that the clinic was soundproofed and that the announcement of purpose could not be heard inside. This fact has not been established by the record. Nevertheless, we are unable to find that the officers actually believed the clinic was soundproofed; if they did, they would not have even bothered to announce their identity.

The respondent contends that, from an examination of the circumstances of this case, it is reasonable to conclude that Efrain knew why the officers were there. Even if the record were to establish that Efrain knew why the officers were there (and we do not agree that it does), we would not be able to hold that the officers were excused from announcing their purpose unless the record also established that the members of the raiding party *believed* Efrain knew their purpose and for that reason decided not to make an announcement. Cf. *Ker* v. *California, supra.* There is no direct evidence on this question.

Our careful examination of the entire record leads us to conclude that the officers entertained no such belief.[16] If they did, it is very difficult to see why the extensive materials in the record before us are devoid of a single reference to such a significant fact and why the "useless gesture" issue was not raised during any of the prior criminal proceedings. We are forced to conclude, as we observed above, that this argument comes to us as an afterthought and not as an accurate reflection of the facts as they existed at the time of the raid.

We hold that the members of the raiding party improperly failed to make an announcement as to purpose.

The raiding officers further violated Efrain's rights under the fourth amendment by virtue of their failure to obtain arrest and search warrants.

The parties are in agreement that, if Efrain was validly arrested, a warrantless search and seizure, with some limitations, could properly follow such arrest. *United States* v. *Rabinowitz,* 339 U.S. 56, 60 (1950).[17] If Efrain was not the subject of a valid arrest then it was essential under the fourth amendment for the officers to obtain warrants in order to conduct a lawful search, especially in view of the fact that the raid was in the planning for several weeks and there was ample opportunity to secure the warrants.[18] *Trupiano* v. *United States,* 334 U.S. 699 (1948).[19]

---

[16] It is interesting to note that the respondent, on brief, has suggested the evidence can indicate that the police had reasonable justification to believe Efrain did not even hear them. See fn. 15 *supra.*

[17] Only a "reasonable" search is permissible. On the question of the scope of a "reasonable" search, *Rabinowitz* was overruled in *Chimel* v. *California,* 395 U.S. 752 (1969). *Chimel,* however, does not have retroactive application. *Williams* v. *United States,* 401 U.S. 646 (1971). We do not reach the question herein of the scope of the search because of our holding that Efrain's arrest was invalid without a warrant.

[18] It is readily apparent from the record that the planning for the raid began as early as November 1963; that the police conducted an investigation for 4 to 6 weeks prior to the raid; that Efrain was "known" to the raiding officers as an alleged abortionist from their prior investigations; that the raiding officers knew that Efrain was using the Ayala Clinic; that the State officials had affidavits and other information from individuals alleging that abortions had occurred in the clinic; and that Barbara Williams had made an appointment for an abortion at the clinic. Doubtless, these factors would have constituted probable cause for the securing of an arrest warrant for Efrain and others in the clinic and for the securing of a search warrant relating to the premises of the clinic. *Carroll* v. *United States,* 267 U.S. 132, 162 (1925); *Wong Sun* v. *United States,* 371 U.S. 471, 479 (1963).

[19] *Trupiano* was overruled in *Rabinowitz* only to the extent it related to searches conducted after *valid* arrests.

We hold that Efrain's arrest was *not* lawful because it was made without a warrant. The respondent insists that no warrant was needed to effect a valid arrest. In support of this position, he argues that a felony was committed in the very presence of one of the members of the raiding party. The respondent further argues that all of the arresting officers had probable cause to believe a felony was being committed in their presence. See *United States* v. *Rabinowitz, supra* at 60, 65. As will be seen from the discussion which follows, we do not agree that the members of the raiding party were justified in making a warrantless arrest.

In his reply brief, the respondent contends that Efrain's arrest was lawful because he committed a felony in the presence of Myrtle Ellison, one of the raiding officers. It is a "well established right of law enforcement officers to arrest without a warrant for a felony committed in their presence," *Trupiano* v. *United States, supra* at 704. However, the respondent does not indicate specifically what felony Myrtle witnessed. Our findings indicate that she observed Efrain accept $1,000 from Barbara. We do not see (nor has the respondent attempted to show) how that action, by itself, constitutes a felony under Florida law. See Fla. Stat. Ann., sec. 775.08 [20] and 797.01.[21] In our view, the record does not even establish that Myrtle saw Efrain *attempt* to commit a felony. See Fla. Stat. Ann., secs. 776.04,[22] and compare *Carter* v. *State*, 155 So. 2d 787 (Fla. 1963). And clearly, Myrtle did not see Efrain engaged in a conspiracy. See *King* v. *State*, 104 So. 2d 730 (Fla. 1957), and *Rodriguez* v. *State, supra.*

With regard to whether the officers had probable cause to believe a felony was being committed in their presence, the respondent argues on brief:

the raiding officers had no way to know positively in advance that petitioners would accept the marked $1,000 from Barbara Williams until Mrs. [Myrtle] Ellison so advised them immediately before knocking on the door. However, at

---

[20] Sec. 775.08 provides:

"Any crime punishable by death, or imprisonment in the state prison, is a felony, and no other crime shall be so considered. Every other offense is a misdemeanor."

[21] Sec. 797.01 provides:

"Whoever with intent to procure miscarriage of any woman unlawfully administers to her, or advises or prescribes for her, or causes to be taken by her, any poison, drug, medicine or other noxious thing, or unlawfully uses any instrument or other means whatever with the like intent, or with like intent aids or assists therein, shall, if the woman does not die in consequence thereof, be punished by imprisonment in the state prison not exceeding seven years, or by fine not exceeding one thousand dollars."

[22] Sec. 776.04 provides:

"Whoever attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such an offense, but fails in the perpetration, or is intercepted or prevented in the execution of the same, shall, when no express provision is made by law for the punishment of such attempt, be punished as follows:

\*   \*   \*   \*   \*   \*   \*

"(2) If the offense attempted to be committed is punishable by imprisonment in the state prison for life, or for five years or more, the person convicted of such attempt shall be punished by imprisonment in the state prison not exceeding five years, or in the county jail not exceeding one year."

the moment of their knocking and announcement of their identity, they had reasonable belief that a felony was being committed inside the clinic by virtue of their knowledge that the marked money had been accepted and that petitioner had agreed to perform the abortion, combined with other knowledge from affidavits and from an informer. * * *

We cannot agree that the officers had probable cause to believe that a felony was being committed in their presence once they knew that Efrain had accepted the $1,000. They were aware (because it was part of their plan) that Barbara would not permit Efrain to commence any medical procedure relating to her "abortion." They were also aware that Barbara was not even pregnant. It is likely that if they had probable cause to believe anything, it was that Efrain was *not* committing any felonious act. We fail to see how knowledge of the acceptance of the $1,000, even if combined with their other knowledge, caused the members of the raiding party to believe that, at the moment of their entry, Efrain was engaged in the commission of a felony.

Finally, the respondent argues that the raiding party's rising fears for Barbara's safety permitted them to enter the clinic without warrants for the purposes of rescue and thereafter to make arrests and to search for and seize items within the clinic. As we pointed out in our discussion above, we do not believe that the raiding offices developed any sudden concern for Barbara's well-being. They knew in advance the situation that would exist, and they had ample opportunity to obtain warrants. The position in which Barbara found herself was not only foreseeable by the raiding officers but was arranged by them. We do not believe that there were any surprise developments or any unexpected emergency which would excuse their forcible entry into the clinic without the requisite warrants. In any event, its seems doubtful to us that the placing of a raiding officer, pursuant to a prearranged plan, in a position of alleged jeopardy can serve to negate constitutional requirements. "If * * * there was a semblance of emergency requiring the breaking of the door, it was created by the officers." *Accarino* v. *United States*, 179 F. 2d 456, 464 (C.A. D.C. 1949); *McKnight* v. *United States*, 183 F. 2d 977, 978 (C.A. D.C. 1950). Accordingly, we conclude that the Miami and Florida authorities were not excused from the securing of warrants because of any necessity to rescue Barbara.[23]

In view of the fact that the officers failed to obtain warrants and failed to announce their purpose, we hold that the disputed records, upon which the respondent has based his determination, were taken

---

[23] Under Fla. Stat. Ann., sec. 901.20, a peace officer may break into a building to liberate a person who entered to make an arrest. The statute does not apply in this case because the officers did not break into the clinic to "liberate" Barbara; they entered the clinic to make an arrest. Furthermore, it is obvious that the provision cannot be regarded as superseding the dictates of the fourth amendment. *Ker* v. *California*, 374 U.S. 23, 38.

from Efrain as the result of an unreasonable search and seizure in violation of the provisions of the fourth amendment.

We must now consider what effect the conclusions we have reached herein have on respondent's determination in the statutory notice in this case.

As we have already noted the parties have stipulated that the determination here is based entirely upon the items seized by the Florida and Miami officials in their raid on the clinic and leads derived therefrom. Because of our conclusion that this evidence is subject to the exclusionary rule developed under the fourth amendment, we must consider Efrain's argument that the statutory notice is illegal and void, or in the alternative, that it loses its presumption of correctness.

The respondent contends that the notice is valid because it satisfies the requirements of section 6212(a) and (b) of the 1954 Code and because it is not proper for this Court to go behind the statutory notice to examine the facts or circumstances upon which its determinations are based.[24]

As a general rule, this Court will not look behind a deficiency notice to examine the evidence used or the propriety of the respondent's motives or of his administrative policy or procedure in making his determinations. *Estate of David Smith*, 57 T.C. 650, 656 (1972); *Arthur Figueiredo*, 54 T.C. 1508, 1513 (1970), on appeal (C.A. 9, Oct. 14, 1970); *Philip F. Flynn*, 40 T.C. 770, 772 (1963); *Charles Crowther*, 28 T.C. 1293, 1301 (1957), affirmed as to this issue 269 F. 2d 292 (C.A. 9, 1959); *H. F. Kerr, et al.*, 5 B.T.A. 1073, 1095 (1927). As we observed in *Terry C. Rosano*, 46 T.C. 681, 687 (1966), "the Commissioner's determinations may often rest upon hearsay or other inadmissible evidence, and we know of no rule of law calling for a review of the materials that were before the Commissioner in order to ascertain whether he relied upon improper evidence."

We regard the general rule enunciated in the cases cited above as sound. In reality, we are not called upon to depart from that principle in the instant case in view of the fact that the respondent has admitted by stipulation the nature of the evidence upon which he relied in preparing his statutory notice.

We are not simply confronted herein with a case in which the respondent based his determination on evidence which is inadmissible under the usual rules of evidence, e.g., hearsay. On the contrary, it must be emphasized that the respondent, in preparing his statutory notice, relied solely on evidence which was illegally seized in violation

---

[24] The respondent points out that the provisions of the Tax Reform Act of 1969, establishing the United States Tax Court under art. I of the Constitution, do not change the applicable legal principles. See sec. 961, Tax Reform Act of 1969.

of the provisions of the fourth amendment. We are therefore not dealing with a mere procedural rule of evidence. Cf. *Kaufman* v. *United States*, 394 U.S. 217, 222–225 (1969). In *Estate of David Smith, supra,* we stated (p. 656):

it is well established that—*at least where unconstitutional conduct is not involved*—the courts will not inquire into the administrative policies and procedures employed by the respondent prior to making his determination. * * * [Emphasis added.]

Where infringements of constitutional rights are involved, we are convinced that the determination in a statutory notice should be carefully scrutinized and that some sanction should be imposed to discourage the Commissioner's use of and reliance on constitutionally inadmissible evidence.

We are unable to agree, however, with the suggestion that the statutory notice here must be declared a nullity. We find no authority for this conclusion. On the contrary, *Helvering* v. *Taylor*, 293 U.S. 507 (1935), teaches that when a petitioner makes a showing casting doubt on the validity of a deficiency determination, the statutory notice itself is not rendered void; the result of such showing is that the respondent must then come forward with evidence to establish the existence and amount of any deficiency. See also *Federal National Bank of Shawnee*, 16 T.C. 54, 63–64 (1951).

We are also unable to agree with petitioners' argument that the burden of proof in the case should be shifted to respondent. In situations where illegally obtained evidence has appeared, the courts have done no more than place the burden on the prosecutor to cleanse the evidence. *Alderman* v. *United States*, 394 U.S. 165, 183 (1969); *United States* v. *Wade*, 388 U.S. 218, 240 (1967); *Nardone* v. *United States*, 308 U.S. 338, 341 (1939); *Baker* v. *United States*, 430 F.2d 499 (C.A.D.C. 1970); *United States* v. *Coplon*, 185 F.2d 629, 635 (C.A. 2, 1950). See also *United States* v. *Blue*, 384 U.S. 251, 255 (1966).

However, in the realm of the criminal law, where the exclusionary rule was born, suppression of tainted evidence serves as an effective disincentive to its use by the Government because the Government has the burden of proof. Clearly such disincentive does not exist in a civil tax case if the sole action taken is to suppress such evidence and the burden of proof and of going forward with the evidence remains on the taxpayer. We therefore conclude that in addition to suppression of the tainted evidence here we must also take further action.

We believe the respondent has a duty in the case at bar not only to cleanse the evidence but also, if he wishes to be sustained in his determination herein, to present evidence to support it which is free of unconstitutional taint.

We therefore conclude and hold that the determination before us, based entirely on constitutionally inadmissible evidence, carries no presumption of correctness. Because the presumption of correctness has disappeared, the respondent now has the burden of going forward with the proof to establish the existence of a deficiency with independent evidence, separate and apart from the tainted evidence. See *Federal National Bank of Shawnee, supra.*

In accordance with the foregoing discussion, an order will be entered by the Court in which we will take the following action with regard to the motions Efrain has filed with the Court.

(1) Motion to Strike the Affirmative Allegations of the Amended Answer and Judgment on the Pleadings: *Grant* that portion of the motion which relates to striking affirmative allegations in the amended answer and *deny* that portion of the motion which relates to judgment on the pleadings. Because the burden of going forward with proof in this case has been shifted to the respondent, who must now produce evidence which is not the fruit of an illegal search and seizure, the respondent shall have leave to file a further amended answer containing a statement of any facts upon which he will rely at trial to sustain his asserted deficiency.

(2) Motion to Strike and Suppress Evidence and to Quash Subpoenas and Subpoenas Duces Tecum: *Grant* the motion.

(3) Motion to Quash the Statutory Notice of Deficiency and to Dismiss for Lack of Jurisdiction: *Deny* the motion.

(4) Motion to Return Property: *Deny* the motion. We see no benefit inuring to Efrain from our ordering the respondent to return *copies* of the seized materials, and we see no harm coming to Efrain from our failure to do so. The originals of the disputed records were ordered returned to him by the Criminal Court of Record on May 22, 1970. Furthermore, we note that the respondent's copies were not obtained from Efrain.

(5) Motion to Shift Burden of Proof: *Deny* the motion, but order that since the presumption of correctness normally attaching to a determination by respondent of a deficiency in a statutory notice has been destroyed, the burden of producing and going forward with proof has shifted to respondent.

Reviewed by the Court.

*An appropriate order will be entered.*

---

DRENNEN, *J.*, concurring: I agree with the majority opinion up to the point where it discusses the procedural effect derived from the removal of the presumption of correctness of respondent's determination because it was founded on tainted evidence. Under the peculiar

circumstances of this case, wherein it is stipulated that respondent's determination is based entirely on illegally obtained evidence, I think the majority is justified in holding that the burden of going forward has shifted to the respondent. Where such is not the case, however, and respondent may also have support for his determination of petitioners' taxable income with legally obtained evidence, I do not believe petitioner should be relieved of his burden of showing that his income tax returns are accurate even though he has been the victim of a constitutional violation. If petitioner establishes a prima facie case, respondent should then be required to prove his case with untainted evidence.

The majority does not hold that the notice of deficiency is invalid, even where it is based entirely on tainted evidence. If it were otherwise this Court would have no jurisdiction to proceed. *John W. Heaberlin*, 34 T.C. 58. Nor has the majority shifted the burden of proof with respect to the underlying deficiency to respondent, which it would be hard pressed to do under the law and the rules of this Court, absent some affirmative allegations by respondent. Petitioner filed a petition asking this Court to redetermine the correct amount of his tax liability. The Court would not be able to do this without some evidence concerning his correct taxable income. The presumption of correctness normally attaching to respondent's determination having been removed, the issue before the Court would be in equilibrium unless some evidence is presented. Petitioner, being the moving party, should provide sufficient evidence to make a prima facie case; otherwise his petition will fail from inertia. Unless the respondent has the burden of proof, I see little reason for him to move forward.

The dual need to protect the integrity of the Court's procedures and the need to discourage constitutional violations are both adequately met by removing the presumption of correctness of respondent's determination and by excluding the tainted evidence.

I cannot agree with the implications of Judge Simpson's dissenting opinion that the application of the exclusionary rule in civil tax cases will necessarily permit those engaged in illegal activities to avoid paying a tax on their income because a court determines that the police acted improperly in securing evidence. The Internal Revenue Service has a variety of methods for determining a taxpayer's taxable income without reliance on tainted evidence or the fruits thereof.

STERRETT, *J.*, agrees with this concurring opinion.

---

TANNENWALD, *J.*, concurring: I agree with the result which the majority reaches but deem it advisable to append certain observations along two principal lines.

First, I think it should clearly be understood that the majority opinion in no way impinges on the validity of respondent's deficiency notice as such. Section 6212 provides for the issuance of a notice of deficiency where the Commissioner determines that there is a deficiency in respect of certain taxes. Nowhere in the Code is there a provision which specifies the nature and quality of the evidence which the tax administrator must gather to support his determination. The absence of statutory guidelines suggests that Congress intended that the Internal Revenue Service should have great latitude in making determinations of liability.

Cases such as *Helvering* v. *Taylor*, 293 U.S. 507 (1935), and its progeny, which encompass a holding that a determination is "arbitrary," "capricious," "excessive," or "invalid" are beside the point. A deficiency notice, supported by factually reliable, albeit illegally obtained, evidence is not properly subject to any of these characterizations. The troublesome aspects of illegally obtained evidence relate not to its lack of probative value but to the way it was acquired. Thus, the relevant inquiry, in a situation such as is involved herein, is directed to the limitations which should be imposed upon the respondent at the trial (including, but not limited to, the question of what evidence he may introduce) and not to an evaluation of his determination in light of the evidence upon which it is based.[1]

This brings me to the second point. Illegal action in the context of a criminal investigation may enable the authorities to determine that someone has committed a crime. But, the prosecution has and must carry its burden of proof without the use of the fruits-of-law violations by public officials in order to obtain a conviction. Thus, as the majority opinion points out, in the realm of the criminal law where the exclusionary rule was born, the mere suppression of tainted evidence has been deemed an adequate and effective disincentive.

In a civil tax case, however, the knowledge that illegally obtained evidence will be inadmissible at trial may not be a sufficient disincentive

---

[1] Compare *United States* v. *Blue,* 384 U.S. 251 (1966), where defendant was charged criminally with attempting to evade income taxes. Blue challenged the validity of the indictment, claiming that he was compelled to incriminate himself due to the necessity of filing petitions for review of jeopardy assessments in the Tax Court. Mr. Justice Harlan, speaking for the Court, held:

"Even if we assume that the Government did acquire incriminating evidence in violation of the Fifth Amendment, Blue would at most be entitled to suppress the evidence and its fruits if they were sought to be used against him at trial. * * * Our numerous precedents ordering the exclusion of such illegally obtained evidence assume implicitly that the remedy does not extend to barring the prosecution altogether. So drastic a step might advance marginally some of the ends served by exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book. [*Id.* at 255 (dictum).]"

The case was remanded to the District Court for proceedings on the merits, leaving Blue free to pursue his fifth amendment claim through motions to suppress and objections to evidence.

due to the fact that the taxpayer, not the Commissioner, has the burden of proof. A large number of tax cases are decided almost exclusively on the basis of the taxpayer's failure to carry his burden. The majority opinion recognizes that fashioning an appropriate disincentive for law violations in the preparation of a civil tax case thus presents a much more difficult problem. The majority's solution is to impose the further sanctions of destroying the presumption of correctness of the respondent's determination and shifting the burden of going forward to him. However, it still leaves the burden of proof upon the petitioner.

Clearly the majority action is in the right direction. But I am not satisfied that such judicial sanctions will always fully implement the policy of deterrence and the need to protect the integrity of the judicial process which the courts have articulated as the foundation for the exclusionary rule. For example, there can be a situation where the respondent makes extensive use of illegally obtained evidence to develop a net worth statement and to make a determination based upon such statement. In *Holland* v. *United States*, 348 U.S. 121 (1954), the Supreme Court clearly indicated its chary regard for such statements. Thus, it stated (348 U.S. at 125) that "careful study indicates that it [a net worth statement] is so fraught with danger for the innocent that the courts must closely scrutinize its use." And it pointed out that "bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them." See 348 U.S. at 128. To be sure, these comments were made in the context of a case involving a criminal jury trial where caution is the accepted order of the day, but I am convinced that similar caution is demanded where courts are confronted with evidence that a taxpayer's rights have been transgressed through law violations by public officials and where there are indications that such violations may well have provided the underpinning for the net worth statement and the resulting deficiency.

I believe that, in some instances, it may be necessary to go further than the majority, e.g., where there is a complicated or reconstructed factual situation such as a net worth case, or where there are substantial difficulties in determining what evidence is "tainted" and what is not. In such situations, a shift to the respondent of the burden of persuasion may be justified [2] in order to prevent the respondent from constructing a deficiency notice behind which he may hide, leaving the taxpayer to sustain this usual burden of proof. I recognize that it is a rare tax case in which the mind of the trier of the facts is in equilibrium and that, in this context, the location of the burden of persuasion, as

---

[2] I am not unaware of the fact that the exercise of judicial discretion to shift the burden of proof may be inhibited by the fact that Rule 32 of the Court's Rules of Practice categorically places that burden on the petitioner and by the opposite inferences as to legislative intent which can be drawn from the fact that the Internal Revenue Code specifically places that burden on respondent in well-defined situations. See secs. 534, 6902(a), and 7454. But, compare *Helvering* v. *Taylor*, 293 U.S. 507 (1935).

distinguished from the burden of going forward with the evidence, is usually of little consequence. But such situations can occur and I do not think this Court should abandon, under all circumstances,[3] an additional judicial sanction that could otherwise be available to it.[4]

I am not impressed with the argument that applying the protection of the fourth amendment and of accompanying judicial sanctions which may be found advisable will hamper the courts through delays in proceedings and increased litigation. A taxpayer, in order to invoke that protection, must establish that illegal means of obtaining evidence were used. See, e.g., *Alderman* v. *United States*, 394 U.S. 165, 183 (1969); *United States* v. *Wade*, 388 U.S. 218, 240, fn. 31 (1967); *Nardone* v. *United States*, 308 U.S. 338, 341 (1939). A mere allegation that such action took place is insufficient. Moreover, the courts can accept a statement by the Government that its files reveal no evidence of any such action. See *United States* v. *Hauff*, 461 F. 2d 1061 (C.A. 7, 1972).

Nor is it material that the respondent's agents themselves did not conduct the illegal raid. It is enough that the evidence was acquired by them from local government officials who seized it in violation of the petitioners' constitutional rights. *Ker* v. *California*, 374 U.S. 23 (1963); *Mapp* v. *Ohio*, 367 U.S. 643 (1961); *Elkins* v. *United States*, 364 U.S. 206 (1960); *Weeks* v. *United States*, 232 U.S. 383 (1914).

Any analogy to grand jury proceedings is beside the point. A comparison of such proceedings to the process by which the respondent arrives at his determination ignores the cardinal fact that, after an indictment, the burden of persuasion remains with the Government— a burden which is measured by a very high standard of proof, i.e., beyond a reasonable doubt—while, in the case of a determination by respondent, the burden of proof as to the underlying deficiency remains with the taxpayer. Similarly, in respect of sentencing and parole proceedings, the question is merely the measure of the penalty which the defendant should pay after the Government has first satisfied its burden of proof that a penalty should in fact be imposed.

I find the contention that the majority decision will benefit persons with unclean hands by relieving them from the responsibility of paying their share of taxes completely unacceptable. The fact of the matter is that respondent is afforded many weapons by means of which he

---

[3] I note that, given respondent's stipulation herein as to the sources of his evidence, the majority action may well have the same practical effect as a shift in the burden of proof.

[4] I recognize that civil tax cases involving the use of illegally obtained evidence may also involve a determination of additions to tax for fraud as to which the respondent has the burden of proof. But the instant litigation bears mute witness to the fact that this is not always the case. Moreover, it cannot be gainsaid that the concomitant placing of the burden of proof as to the basic deficiency upon the taxpayer can result in a decision against him for a susbtantial amount even though respondent fails to carry his burden of proof as to the fraud issue. See *Drieborg* v. *Commissioner*, 225 F.2d 216, 218 (C.A. 6, 1955), reversing on other grounds a Memorandum Opinion of this Court.

can require such persons to pay the taxes they owe. He has the power of subpoena and he has available to him various broad techniques for developing a person's taxable income, e.g., net worth, bank deposits, and cash expenditures. The question in this case is not whether we are depriving respondent of the means of requiring petitioners to bear their share of the tax burden, but whether we should add a further weapon to respondent's arsenal at the expense of petitioners' constitutional rights. The choice between constitutional protections and the conveniences of litigation to the Government seems to me to be obvious, particularly in light of the fact, as the majority points out, that "The costs to society of applying the exclusionary rule to civil tax cases are substantially less than in the criminal area."

The essence of a democratic society demands that the protection of law be accorded to *all* of its citizens, irrespective of any particular characterization which may be applicable to them. As I said in my dissenting opinion in *Hugo Romanelli*, 54 T.C. 1448, 1467 (1970):

Our democratic institutions, including our judicial system, can survive the present onslaught upon them only if they are tempered with qualities of respect and understanding for the rights of the individual. This does not mean that we should confer an open-ended license for each person to do as he wants and to ignore his obligations to his fellow citizens, including the payment of taxes. Similarly, it does not mean that the Government, in the name of law and order, should be able to discharge its responsibilities to enforce its civil claims for taxes free of the procedural requirements of due process.

The continued concern that our citizens be protected from violations of law by public officials in the area of illegally obtained evidence is reflected in the enactment of the Omnibus Crime Control and Safe Streets Act of 1968 (82 Stat. 211) and the recent implementation of section 802 thereof (18 U.S.C. sec. 2515) in permitting a person to invoke its provisions as a defense against a contempt charge for failure to testify before a grand jury. See *Gelbard* v. *United States*, 408 U.S. 41 (1972).

Neither the articulation of that concern in resolving the issues in this case, nor the characterization of that articulation as rhetoric, should obscure or change the fundamental constitutional demand that the fourth amendment be applied in a fashion which will meaningfully implement the objectives which it was designed to achieve.

FEATHERSTON and GOFFE, *JJ.*, agree with this concurring opinion.

———

SIMPSON, *J.*, dissenting: I, too, cherish the right of privacy, yet, when the reasons for and the reasons against are weighed, I am convinced that we are not required to extend the "exclusionary rule" to civil tax cases, nor is it wise for us to do so. I must dissent.

In its carefully reasoned opinion, the majority rests its conclusion in part on the classical reason for the exclusionary rule, that is, evidence is excluded in order to deter violations of the fourth amendment. Yet, serious doubts are now being expressed as to whether the application of the exclusionary rule in criminal cases does in fact accomplish that objective. Mr. Chief Justice Burger has said:

> I do not question the need for some remedy to give meaning and teeth to the constitutional guarantees against unlawful conduct by government officials. * * * But the hope that this objective could be accomplished by the exclusion of reliable evidence from criminal trials was hardly more than a wistful dream. Although I would hesitate to abandon it until some meaningful substitute is developed, the history of the Suppression Doctrine demonstrates that it is both conceptually sterile and practically ineffective in accomplishing its stated objective. * * * [*Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 415 (1971), Burger, *C.J.*, dissenting.]

He also pointed out that many others who have studied the operation of the rule have judged it to be ineffective. One of the most extensive of those studies was conducted by Mr. Dallin H. Oaks, who summarized his findings as follows:

> As a device for directly deterring illegal searches and seizures by the police, the exclusionary rule is a failure. There is no reason to expect the rule to have any direct effect on the overwhelming majority of police conduct that is not meant to result in prosecutions, and there is hardly any evidence that the rule exerts any deterrent effect on the small fraction of law enforcement activity that is aimed at prosecution. What is known about the deterrent effect of sanctions suggests that the exclusionary rule operates under conditions that are extremely unfavorable for deterring the police. The harshest criticism of the rule is that it is ineffective. It is the sole means of enforcing the essential guarantees of freedom from unreasonable arrests and searches and seizures by law enforcement officers, and it is a failure in that vital task.
>
> The use of the exclusionary rule imposes excessive costs on the criminal justice system. It provides no recompense for the innocent and it frees the guilty. It creates the occasion and incentive for large-scale lying by law enforcement officers. It diverts the focus of the criminal prosecution from the guilt or innocence of the defendant to a trial of the police. Only a system with limitless patience with irrationality could tolerate the fact that where there has been one wrong, the defendant's, he will be punished, but where there have been two wrongs, the defendant's and the officer's, both will go free. This would not be an excessive cost for an effective remedy against police misconduct, but it is a prohibitive price to pay for an illusory one. * * * [Oaks, "Studying the Exclusionary Rule in Search and Seizure." U. Chi. L. Rev. 755–756 (1970).]

It is not for us to decide whether the exclusionary rule should continue to be applied in criminal cases, or whether that rule should be replaced by some other device for the protection of the right of privacy.[1] However, we do have to decide whether the exclusionary rule

---

[1] As an alternative to the exclusionary rule, the present Chief Justice has suggested a procedure for awarding damages to anyone who has been the victim of an illegal search and seizure. Such a remedy, he suggested, would be more effective because it could be invoked with respect to any illegal search.

should be extended and applied in a new class of cases—civil tax cases. Grave doubts have been presented as to the efficacy of the exclusionary rule, and surely we are not required to extend a rule of such doubtful utility. When others are seeking to restrict the rule and to find an alternative that better serves the public interests, we should not compound the present difficulties by undertaking to apply the rule to additional cases.

There is additional reason for doubting the deterrent effect of applying the exclusionary rule in this case. In *Pizzarello* v. *United States*, 408 F. 2d 579 (C.A. 2, 1969), the exclusionary rule was applied in a proceeding to enjoin a tax assessment, but in that case, the raid was conducted by Treasury agents. However, in this case, the raid was not conducted by the Internal Revenue Service. The intelligence agent who made the investigation learned of the raid by reading about it in a newspaper several days after it had occurred, and he had nothing to do with arranging it. Moreover, there is no reason whatsoever to believe that those officers who did conduct the raid were seeking information relating to the tax liability of Mr. Suarez. Even if the application of the exclusionary rule might have some effect when a raid is conducted by the Internal Revenue Service or when its agents participate in the raid, its application could have no deterrent effect when the raid is conducted by other officers without any purpose of securing tax information.[2] Applying the exclusionary rule will merely bestow upon Mr. Suarez the windfall of possibly relieving him from the tax liability on the income that he earned as a result of his allegedly illegal activities.

The majority also relies upon the concept that evidence secured in violation of the fourth amendment should not be admissible in any court proceeding for any purpose. To admit such evidence, the Court believes, would corrupt the judicial process. It is sometimes said that such evidence is "tainted," and Mr. Justice Brandeis warned about the "anarchy" that would follow from unrestrained police conduct. The use of such dramatic phrases tends to obscure the reasoning process. There is nothing inherently wrong with the evidence seized by the officers, and the courts, for them to function properly, ordinarily welcome and encourage the presentation of all relevant and reliable evidence. For that reason, the law generally favors the

---

[2] Such comment is not inconsistent with *Elkins* v. *United States*, 364 U.S. 206 (1960), in which it was held that evidence secured by an unlawful search by State officers was not admissible in a Federal case. That decision recognized that very often evidence may be indicative of a violation of both State and Federal laws, thus, in criminal cases, it matters not who conducted the unlawful search. I am not suggesting that any distinction should be based upon who conducts the raid, but I am suggesting that only when officers, be they officers of the State or of the Federal Government, are seeking tax information, will they be restrained by the prospect of the application of the exclusionary rule in civil tax cases.

admission of all such evidence, unless there is some compelling reason for its exclusion. In considering the possible corruption of the judicial process, one should also bear in mind that the courts are being used as the "tool" of those whose hands are unclean—the exclusionary rule helps only those persons who have something to hide. Its application relieves them of their responsibility to account to society for their conduct. No one wishes to condone unrestrained police conduct, but in considering whether to extend the exclusionary rule to civil tax cases, one must weigh the possible danger of admitting the evidence in such proceedings against the harm to society that may occur if the evidence is excluded.

In our self-assessment tax system, all people are required to report their income and to pay the tax due thereon, however painful that process may be. Yet, how are the people going to react if they learn that those who are engaged in illegal activities are excused from paying a tax on their income because a court determines that the police acted improperly in securing evidence? Although the exclusionary rule has been applied in some civil proceedings, the consequences of doing so in tax cases will be altogether different. Applying the rule in a case involving an alleged violation of a housing code or involving a dispute over customs duties is not going to have any widespread effect upon the compliance with those laws, but the application of the rule in civil tax cases raises the prospect of seriously undermining the practice of voluntary compliance with the tax laws.

In several cases, the Supreme Court has held that a grand jury must be free to consider whatever evidence comes to its attention; it must not to be shackled in its operations by the nice rules of evidence. *United States* v. *Blue*, 384 U.S. 251 (1966); *Lawn* v. *United States*, 355 U.S. 339 (1958); *Costello* v. *United States*, 350 U.S. 359 (1956). In *Costello*, the Court said at page 362:

The grand jury is an English institution, brought to this country by the early colonists and incorporated in the Constitution by the Founders. There is every reason to believe that our constitutional grand jury was intended to operate substantially like its English progenitor. The basic purpose of the English grand jury was to provide a fair method for instituting criminal proceedings against persons believed to have committed crimes. Grand jurors were selected from the body of the people and their work was not hampered by rigid procedural or evidential rules. In fact, grand jurors could act on their own knowledge and were free to make their presentments or indictments on such information as they deemed satisfactory. * * * [3]

In addition, there are other situations in which the courts have recognized that the advantages of using evidence, however obtained,

---

[3] In its recent decision in *Gelbard* v. *United States,* 408 U.S. 41 (1972), the Supreme Court again approved its holding in *Costello* v. *United States,* 350 U.S. 359 (1956), although it held that a witness could not be compelled to appear and testify before a grand jury with respect to information secured by an illegal wiretap.

outweighed any reasons for excluding it. In *United States* v. *Shipani*, 435 F. 2d 26 (C.A. 2, 1970), evidence obtained by wiretapping could be considered for purposes of sentencing, and in *United States ex rel. Sperling* v. *Fitzpatrick*, 426 F. 2d 1161 (C.A. 2, 1970), similar evidence was considered in a parole revocation proceeding.

The role of the Commissioner is somewhat similar to that of the grand jury.[4] He has the grave responsibility of administering this vast tax system, including the responsibility of initiating proceedings to collect the tax from anyone who does not voluntarily disclose and pay his share. If the Commissioner learns, from reliable information, that a person has not complied with the tax laws, he should investigate and take the appropriate steps to see that such person does comply with the law. When the agent first learned of the raid from the newspaper, should he have closed his eyes to the possibility that Mr. Suarez may not have been reporting his income from his allegedly illegal activities? Perhaps there were other ways in which Internal Revenue could have made an investigation of the possibility, but it was offered direct evidence of such activities. It seems to me that the Commissioner and his staff are not required to close their eyes to indications of possible unreported income; indeed, in my opinion, it is their responsibility to accept that evidence and to make appropriate use of it in the performance of their official duties.

In deciding not to apply the exclusionary rule to proceedings before the grand jury, the Supreme Court recognized that if the rule was made applicable in such proceedings, it would delay them and result in increased litigation. *Costello* v. *United States, supra* at 363. The Court's opinion in the case before us illustrates some of the difficulties that occur when we undertake to exclude evidence obtained by an allegedly illegal search. When a taxpayer seeks to invoke the rule, it then becomes necessary to determine whether there has been an illegal search. In this case, the Court concludes that the police were not excused from announcing their purpose before breaking down the door and entering because of their claimed fear of possible harm to their colleague, Barbara. It seems to me that such a conclusion totally ignores the reality of human emotions. It is one thing for us, sitting in the calm of our chambers, to conclude that the police did not act as a result of fear of harm to Barbara; if we had been on the scene, we

---

[4] I am suggesting merely that the roles of the Commissioner and the grand jury are similar in that they both are expected to consider all available information in order to determine what actions should be initiated. I recognize that in a criminal case, the prosecutor still has the burden of establishing the defendant's guilt by admissible evidence; thus, the grand jury's consideration of evidence improperly obtained may not be decisive. However, the exclusionary rule has also been applied in the sentencing and parole revocation proceedings, even though the evidence secured by an improper search may be decisive in those situations.

might well have acted as the police did. Despite the fact that Barbara was experienced and trained, they knew that she was somewhere in the clinic with a man who might become desperate, and he might have others to assist him in overpowering Barbara. Although the police knocked several times before breaking down the door, the fact that they could not enter may have increased their concern because they could not reach Barbara and provide her with any necessary assistance.

The majority also concludes that the police were at fault in failing to announce their purpose when they knocked. That conclusion also seems to me to ignore reality. When a person is engaged in the illegal activities allegedly performed by Mr. Suarez, and the police knock at his door, it would not require much imagination on his part to know why they were there; he could guess the answer with virtual certainty. To say that under those circumstances, the police should have stated their purpose, in my opinion, insists upon a technical compliance with the law which is not at all necessary to protect one's constitutional rights.

In conclusion, I suggest that whatever may be the justification for applying the exclusionary rule in criminal cases, there is sufficient doubt about its efficacy so that it should not now be extended to civil tax cases. Moreover, if it is extended at all to such cases, it should not be applied with respect to the information on which a notice of deficiency is based, and it should only be done when the Internal Revenue Service is involved in a violation of the fourth amendment. Finally, if the rule is applied to civil tax cases, it should be done in the manner suggested by the American Law Institute by excluding the evidence only when there is a finding that the violation was substantial. See A.L.I. Model Code of Pre-Arraignment Procedures, sec. SS 290.2(2) (Proposed Official Draft No. 1, 1972). Such an approach enables the courts to protect adequately an individual's constitutional rights, without unnecessarily interfering with the operations of the Government and its officials.

RAUM, *J.*, agrees with this dissent.

